[675 NYS2d 605]

In the Matter of the Custody and Guardianship of SASHA R. ANGEL GUARDIAN HOME, Appellant; JESUS H. et al., Respondents.

First Department, July 23, 1998

## APPEARANCES OF COUNSEL

*Richard Jay Warren* of counsel (*Ira L. Eras* on the brief; *Warren & Warren, P. C.,* attorneys), for appellant.

*Howard M. Simms* for respondents.

*Kenneth Rabb* of counsel (*Rubye Williams* on the brief; *Jane M. Spinak, Law Guardian),* for infant.

## OPINION OF THE COURT

NARDELLI, J. P.

We deal herein with the rights of the imprisoned natural father of a child. While the parental rights of even an imprisoned father must not be disregarded, the best interests of the child must be kept paramount. The courts should evaluate the incarcerated parent's planning efforts without setting unrealistically high standards, but at the same time without indefinite continuation of foster care where the parent cannot provide an alternative living arrangement (*see, Matter of Gregory B.,* 74 NY2d 77, 89). In the circumstances presented herein, we disagree with the conclusions reached by the Family Court, which dismissed the petition seeking a finding of permanent neglect.

The child herein, Sasha R., was born on July 16, 1992, with a positive toxicology for cocaine, to a crack-addicted mother, Naomi R., who has wanted to give Sasha up for adoption from the onset. Four of the mother's previous children were removed from her custody because of her addiction. Two of them, Victor and Jose, were placed with the V. family, who adopted them. Sasha was placed in foster care on August 4, 1992, and, four days later, placed with the petitioner agency. At the age of two months, the child was placed with her half-siblings at the V. family.

Respondent, Jesus H., the alleged father, has a history of 10 convictions, and was last arrested on February 5, 1992, for selling drugs, for which he later received a sentence of 6 to 12 years.

Initially, while the agency asserts that the Family Court erroneously found that Domestic Relations Law § 111 (1) (d) does not apply to permanent neglect proceedings or to parents of infants placed with adoptive parents less than six months after birth, the Family Court properly found that Jesus H.'s status as a "consent father" did not have to be demonstrated

under this section, which reads in pertinent part: "Domestic Relations Law § 111 (1) (d) provides that consent to adoption is required of the father, 'only if such father shall have maintained substantial and continuous or repeated contact with the child as manifested by: (i) the payment by the father toward the support of the child of a fair and reasonable sum, according to the father's means, and either (ii) the father's visiting the child at least monthly when physically and financially able to do so and not prevented from doing so by the person or authorized agency having lawful custody of the child, or (iii) the father's regular communication with the child or with the person or agency having the care or custody of the child, when physically or financially unable to visit the child or prevented from doing so by the person or authorized agency having lawful custody of the child.' "

The consent requirement is applicable to subdivision (4) (b) of Social Services Law § 384-b, dealing with abandonment, subdivision (4) (c), dealing with mental illness or mental retardation, and subdivision (4) (e), dealing with the severely or repeatedly abused child. While the consent requirement has been omitted from Social Services Law § 384-b (4) (d), dealing with permanent neglect, the ground upon which the present petition was brought, we cannot, as urged by petitioner, extend what the Legislature has provided and read into the law a parental status inquiry in cases involving issues of permanent neglect (*see, Bender v Jamaica Hosp.*, 40 NY2d 560, 562). "We have provided further clear teaching and guidance that '[a]bsent ambiguity the courts may not resort to rules of construction to broaden the scope and application of a statute', because 'no rule of construction gives the court discretion to declare the intent of the law *when the words are unequivocal*' (*Bender v Jamaica Hosp.*, 40 NY2d 560, 562 [emphasis added] [citations omitted]). Lastly, '[t]he courts are not free to legislate and if any unsought consequences result, *the Legislature is best suited to evaluate and resolve them*' (*id.* [emphasis added]))." (*Matter of Raritan Dev. Corp. v Silva*, 91 NY2d 98, 107.)

Since permanent neglect was pleaded by petitioner and petitioner's status challenge was invalid based on the statutory irrelevance, the Family Court properly rendered a determination as to permanent neglect.

■ However, we agree with petitioner that it was excused from the threshold issue of demonstrating that it exercised diligent efforts both due to the respondent father's failure for a period of six months to keep the petitioner agency apprised of

his location, and his failure on more than one occasion to cooperate with the agency.

Social Services Law § 384-b (7) (e) provides in pertinent part:

"evidence of diligent efforts by an agency to encourage and strengthen the parental relationship shall not be required when:

"(i) The parent has failed for a period of six months to keep the agency apprised of his or her location; or

"(ii) An incarcerated parent has failed on more than one occasion while incarcerated to cooperate with an authorized agency in its efforts to assist such parent to plan for the future of the child".

Within days of Sasha's placement in foster care with the agency (in August 1992), the father obtained the agency's address and phone number from the caseworker Kelsey Crowe. Ms. Crowe was at the home of the mother, Naomi R., when respondent called and Ms. Crowe provided him with the address and telephone number and asked him to contact her. While respondent told Ms. Crowe he was incarcerated, he did not give the name of the institution and Naomi R. refused to provide it to the caseworker. Finally, on March 2, 1993, respondent telephoned Ms. Crowe to ask about Sasha. The Family Court erroneously found that simply because respondent told the agency he was incarcerated, the agency had the means to communicate with him. However, the respondent was known by three different surnames in his dealings with the agency and the court itself recognized that the respondent has used many different aliases over the years. Further, the three surnames were all common ones and the agency did not know respondent's date of birth, the date of his conviction, his prison identification number, or even the crime for which he was convicted. Also, according to respondent's own testimony, during an 18-month period, he was at Rikers Island, Downstate Correctional Facility, Sing Sing Correctional Facility, Washington Correctional Facility, Comstock Correctional Facility, Clinton Correctional Facility and Franklin Correctional Facility. Thus, even assuming the agency had been fully apprised of respondent's true name and location, there was still a need for him to keep the agency apprised of his whereabouts at the various relevant times. In fact, Social Services Law § 384-b (7) (e) (i) requires a parent to "keep the agency apprised of his or her location." Although respondent sought to excuse his failure to telephone because of long lines at the various centers of inmates waiting to use the phones, he managed to call Naomi

R. on more than one occasion. Moreover, respondent could always have used the mails.

Since the father "failed to keep the agency apprised of his whereabouts for at least six months, the agency was not required to make diligent efforts to encourage and strengthen the parental relationship" (*Matter of Crystal K.*, 204 AD2d 105, 106; *Matter of Desire Star H.*, 202 AD2d 582, *appeal dismissed* 85 NY2d 905).

In addition, respondent failed to cooperate with the agency on more than one occasion during his incarceration, thus excusing the agency from the "diligent efforts" requirement. As noted, since respondent did not contact the agency for more than six months after the initial placement of Sasha, the agency was unable to plan for visits by the child to Rikers Island, where respondent was incarcerated at the time. A year later, when he *did* contact the agency, he was upstate and the agency could not transport the child, who suffered from asthma, the much greater distance. Also, Ms. Crowe, in a June 16, 1993 letter, urged respondent to speak to a lawyer about seeking legal paternity for Sasha and perhaps taking a paternity test. Respondent did not follow up on either of these suggestions. While respondent was upstate at the Washington Correctional Facility, Ms. Crowe urged him to speak to his counselor to explore the possibility of being transported downstate periodically for visits with the child. Respondent did not follow this advice.

"[E]vidence of the diligent efforts of the agency shall not be required when, as here, an incarcerated parent has failed on more than one occasion while incarcerated to cooperate with an authorized agency in its efforts to assist such parent to plan for the future of the child" (*Matter of Anthony R.*, 239 AD2d 586, 587, *lv denied* 90 NY2d 808).

■ Moreover, contrary to the conclusion of the Family Court, we find, in any event, that there was clear and convincing evidence that the agency exerted diligent efforts to assist respondent in planning for his daughter. Once the caseworker ascertained the whereabouts of respondent, she investigated the possibility of visitation and advised respondent to speak to a counselor about this possibility. Respondent failed to do so. The agency also diligently worked with respondent's sister Gloria A., the sole resource proposed by him for Sasha. The agency encouraged visits by Mrs. A., even after she indicated she did not realize how much attention Sasha needed and did not want to assume the responsibility. While the Family Court termed

such a decision by the agency "inexplicable," it is understandable and laudable that the agency tried to strengthen the paternal ties through respondent's sister. It also kept respondent informed of Sasha's adjustment to the foster home, her medical problems and her development. Again, contrary to the conclusion of the Family Court, the decision by the agency to move Sasha to the foster home where her half-siblings resided was reasonable and appropriate. Thus, Family Court Act § 1027-a specifically requires that when removed from the home, the child be placed with "his or her minor siblings or half-siblings" unless contrary to the best interests of the child.

The father, with all the help the agency was able to give him, did not present a realistic and feasible plan to establish a stable home for Sasha. Thus, when his sister abandoned plans to care for the child, his sole plan was for Sasha to remain in foster care until he was released from prison. "It is true that the Legislature acknowledged the 'special circumstances' of an incarcerated parent and intended that those circumstances be considered in evaluating such parent's efforts to meet the statutory contact and planning requirements. Certainly, in light of the drastic consequences of failing to plan, courts should not set unrealistically high standards in evaluating a parent's planning efforts (*see, Matter of Orlando F.*, 40 NY2d, at 111, *supra*) and this directive undoubtedly applies with special force in cases where the parent is incarcerated and thus severely hampered in the ability to act on behalf of his or her child. This does not mean, however, that the Legislature intended to approve a plan of indefinite foster care for the child of an incarcerated parent who is serving a lengthy prison term and who cannot provide the child with an alternative living arrangement. Although the statutory scheme favors keeping a child with the natural parent where practicable and stresses the importance of exercising diligent efforts to foster and maintain the cohesiveness of the family unit, 'permanence in a child's life also has been given a priority, because the Legislature has determined that a normal family life in a *permanent* home offers the best opportunity for a child to develop and thrive' (*Matter of Joyce T.*, 65 NY2d 39, 47; Social Services Law § 384-b [1] [a]). Thus, we have acknowledged that a primary purpose of the statute is to provide 'a fair and timely basis to free a child for adoption' and that '[w]hen it is clear that natural parents cannot offer a normal home for a child, and "continued foster care" is not an appropriate plan, the statute directs that a permanent home be sought' (*Matter of Joyce T.*,

65 NY2d, at 47, *supra*; Social Services Law § 384-b [1] [a] [i], [iv])." (*Matter of Gregory B.*, *supra*, 74 NY2d, at 89-90.)

Therefore, since the respondent did not offer any plan for the child besides continued foster care and since the agency exercised diligent efforts to assist him, the petition seeking a finding of permanent neglect should have been granted.

Accordingly, the order of the Family Court, Bronx County (Harold Lynch, J.), entered on or about June 3, 1996, which found that the consent of the respondent father is required for the child to be adopted, and dismissed a cause of action against the father for permanent neglect, should be modified, on the law and the facts, the petition for permanent neglect granted, and the matter remanded for further proceedings, including a dispositional hearing to determine the child's best interests, and otherwise affirmed, without costs.

TOM, MAZZARELLI, ANDRIAS and SAXE, JJ., concur.

Order, Family Court, Bronx County, entered on or about June 3, 1996, modified, on the law and the facts, the petition for permanent neglect granted, and the matter remanded for further proceedings, including a dispositional hearing to determine the child's best interests, and otherwise affirmed, without costs.