OPINION OF THE COURT
Mary E. Bednar, J.
The subject children in this termination of parental rights proceeding — Keyonna R (born on May 23, 1995) and La’Asia *30 S. (born on May 30, 1992) — were placed in foster care on June 20, 1996 after findings pursuant to Family Court Act § 1012 of neglect, based upon medical neglect and domestic violence. Respondent, Tamara S., is the mother of both children while respondent Derek R. is the father only of Keyonna, who suffers from spinabifida. The respondents are married to each other and both are hearing impaired.
On August 3, 1998 the children’s foster care placement was extended. The judge who extended the placement issued a written order requiring the respondents to obtain domestic violence counseling as well as individual and family counseling, and to maintain contact with the agency. The respondents were also ordered to keep the agency apprized of their address and the father was to enroll in an alcohol rehabilitation program. A sign language interpreter was in court when this order was issued, as were the respondents. The instant petitions were filed on September 14, 2000.
At the fact-finding, testimony was given by Salvation Army caseworker Louis Lopez, who was assigned to the respondents, Priscila S., the children’s paternal grandmother, Mary Ann Grossinger, an expert in American Sign Language, and the respondents. Since the respondents understand American Sign Language, a sign language interpreter was provided for all court dates. The petitioner’s case against the father focused on two time periods: July 1998 through July 1999, for which they sought a permanent neglect finding, and March 13, 2000 through September 14, 2000, during which they claim the father abandoned Keyonna. The petitioner also charged that the mother permanently neglected the children for the period from July 1999 through September 2000. The following facts were elicited.
At the time of the extension of placement hearing, the respondents lived together in Michigan while the children resided with their foster parent in New York.[1] Mr. Lopez mailed - a copy of the court’s order to the respondents along with a cover letter explaining that they must enroll in the programs required by the judge. Mr. Lopez also wrote a letter to the respondent father’s probation officer in Michigan, who had been assigned to the father after he was convicted of a crime committed in New York. In this letter Mr. Lopez outlined the stéps the father would have to take to regain custody of Keyonna. *31 The respondent father enrolled in an alcohol rehabilitation program but did not enroll in domestic violence counseling.[2]
The father testified that around Thanksgiving of 1998 Keyonna was hospitalized and he traveled from Michigan to visit her. Other than this visit the father did not see the child until April of 2000. Mr. R. also told the court that between July 1998 and December 1998 he sent cards to Keyonna on major holidays, but did not call her from Michigan, “because I can’t hear, I don’t have a hearing aid, that’s a problem. With the relay, it’s not, you know, it wouldn’t be my voice. I would like Keyonna to hear her father’s voice.” (Transcript, Feb. 27, 2001, at 22, lines 5-8.)
In December 1998 the respondent father was arrested for threatening the respondent mother with a knife. He was incarcerated in a Michigan prison on December 2, 1998 and was released on May 23, 1999.[3]
The father testified that although he is completely deaf, the prison only provided sign language interpreters for court appearances, requiring him to communicate with the prison guards by writing notes. The prison, however, did have a TDY machine, which allows deaf people to make telephone calls. The father had to ask permission to use the phone since it was in an administrative office. He only used it once, to call his grandfather.
The respondent father told the court that he did not ask his grandfather to contact the Salvation Army because he forgot the agency’s address and telephone number and didn’t think that his grandfather had this information. The father, however, did know the name of the agency and that it was near the Fourteenth Street subway stop.
The father claimed that he asked his probation officer to contact the agency, but that he refused to do so. An order of protection prohibited the father from contacting the respondent mother, and he claimed all of his papers and records were left in her home.
In December 1998 the mother told Mr. Lopez that the father was in jail, but that she did not know which prison. Mr. Lopez made no attempt to locate the father the entire time he was *32 incarcerated. After his release from prison the father lived with a friend named Carlos and then stayed with another friend for 30 days. Thereafter he had a 60 day stay in a Michigan homeless shelter. During this period Mr. R. sought no counseling or rehabilitative services whatsoever. In October 1999 the father wrote a letter to Mr. Lopez. It was the first the agency had heard from the father since his incarceration.[4]
The father remained in Michigan. He would occasionally call Mr. Lopez to tell him that he was coming to New York to meet with him and visit Keyonna. Mr. Lopez testified that he explained to Mr. R. that he needed two weeks’ notice to order a sign language interpreter, and that the foster mother needed sufficient time to arrange for visitation. Nevertheless the father continued to come to New York and demand visits with his daughter on only a few days’ notice.
On March 13, 2000, for instance, the father came to New York unannounced and called Mr. Lopez to tell him that he was staying with his grandfather and that he wanted to visit Keyonna. Mr. Lopez told him to call the foster mother, but the father never did so.[5] Soon after, Mr. Lopez learned that the foster mother would be bringing the child to the agency on March 16, 2000, so he called the respondent father’s grandfather[6] and suggested that the respondent father visit the child at the agency. Mr. R. received the message, but did not show up at the agency until 4:00 p.m. By that time the foster mother had already left with the child. The father told Mr. Lopez that he had been delayed because of a court appearance.
On March 31, 2000 Mr. R. called Mr. Lopez from Michigan and told him that he would be in New York in two days to visit Keyonna. The visit never occurred as the foster mother had already made plans for the child and was, therefore, unavailable for a visit. On May 31, 2000 the father called Mr. Lopez and asked to visit Keyonna the weekend starting June 2nd. Once again there wasn’t enough notice to arrange a visit. Before *33 leaving for Michigan the father asked Mr. Lopez to be reimbursed for travel expenses.[7] In addition, every time the father came to New York he would meet Mr. Lopez without the presence of a sign language interpreter, since the father never left enough time to order one. Between June 2000 and the filing date of the petition on September 14, 2000 there was no contact between the father and foster mother. Nor did Mr. R. call or visit the child.[8]
The father was able to visit Keyonna on Easter Sunday 2000 at the home of Priscila S., the child’s maternal grandmother. The maternal grandmother told the court that Keyonna stayed with her every other weekend. When the father visited on Easter 2000, he stayed less than 30 minutes and left her home with the respondent mother, who was also visiting. Before leaving, the father gave money to the maternal grandmother for the child. The maternal grandmother went on to say that between March 13, 2000 and the petition’s filing date, the father would occasionally call her to ask about the respondent mother. In his testimony the father denied that he left with the respondent mother after visiting Keyonna.
Mr. R. further testified that he sent money for Keyonna’s support to the respondent mother even though the child was in foster care and did not reside with Ms. S. To substantiate this claim the father showed the court five Western Union money transfers dated between March 24, 2000 and May 13, 2000, which were made out to the respondent mother, and which ranged in value from $50 to $200. The father testified that he gave the money to the mother, because he trusted neither Mr. Lopez nor the foster parent.
Also introduced into evidence was a letter dated February 22, 2000, written by the father and addressed to Mr. Lopez, in which he asks to be reimbursed for travel expenses between New York and Michigan, and a letter postmarked October 23, 1999 in which Mr. R. expresses a desire to see Keyonna over Thanksgiving. The father told the court that he understood from Mr. Lopez’s letters what was required of him to regain custody of Keyonna. Testimony also established that the father completed a parenting skills course in 1997.
*34 While being cross-examined the father downplayed the incident of domestic violence that landed him in jail.
“Q: Isn’t it true that you were arrested in December of ‘98 because you assaulted Tamara with a knife?
“A: I didn’t assault her.
“Q: What did you do that got you arrested in December of ‘98?
“A: We had an argument.
“Q: Did you touch her?
“A: No.
“Q: You just had an argument?
“A: An argument and I had a knife. We were talking but I didn’t hurt her.
“Q: You did have a knife?
“A: I had a knife. I was holding a knife and we were arguing.” (Transcript, Mar. 6, 2001, at 9, lines 5-18.)
The father also refused to acknowledge that he has an alcohol problem.
“Q: At the time the children were taken away from you, did you have a problem abusing alcohol?
“A: I got drunk once, yes.
“Q: Besides getting drunk once, at the time the children were taken away from you, did you have a problem drinking alcohol many times and drinking too much alcohol more than once?
“A: Not every day.” (Transcript, Mar. 6, 2001, at 54, lines 2-10.)
Overall the father expressed no understanding as to why Keyonna is in foster care. He testified that:
“The reason — they had no reason to take away the children. The parents have rights. The social workers came to the house without an interpreter. She was talking to us and then she looked around at the apartment, she said it looked nice. And then after that, two days later, they told us to go to court and they took the kids. They thought I was abusing the kids, which is not true. There was no proof.” (Transcript, Mar. 6, 2001, at 53, lines 14-23.)
The evidence regarding the mother revealed that when she lived in Michigan she was enrolled for 14 months at the Chelsea Ann Arbor Treatment Center, where she received, substance abuse counseling, domestic violence counseling, and *35 therapy for depression. She moved back to New York City in October 1999.
Soon after the mother returned to New York, Mr. Lopez received a letter from the Chelsea Ann Arbor Treatment Center, which said that the mother needed six more montlis of psychological counseling. Mr. Lopez also found out that the mother received medication for depression while in Michigan, and that she admitted to a caseworker from the Chelsea Ann Arbor Treatment Center that she used marijuana.
Mr. Lopez testified that after receiving this information he told the mother that she needed to get a psychological evaluation as well as go for drug testing. On January 27, 2000, according to Mr. Lopez, at a meeting at the agency, the mother said that she wouldn’t go for a drug test, and stormed out of the building. But on March 1, 2000 the mother apparently changed her mind and agreed to go for a drug test. The drug treatment facility, however, was too crowded to test the mother on that day.
Mr. Lopez also told the court that the mother refused to get tested on November 10, 1999, May 16, 2000 and July 11, 2000. The mother testified that she only refused to get tested on November 10, 1999. She said she refused because there was no sign language interpreter available. The mother never went for a psychological evaluation, once telling Mr. Lopez that she didn’t need one since she had been evaluated in Michigan.
When the mother moved back to New York she was homeless and still had not completed domestic violence counseling. To remedy these problems Mr. Lopez made two referrals. One was for housing at Bronx Independent Living Services (BILS) and the other was for domestic violence counseling at Barrier Free Living (BFL). Both BFL and BILS specialized in working with hearing impaired clients and had sign language interpreters on staff. In fact, the mother was enrolled at BFL for a short time in 1996 and told Mr. Lopez about both BFL and BILS.
Mr. Lopez testified that he went with the mother to look at apartments on June 15, 2000 and June 20, 2000, but that the mother thought the apartments they saw were either too small or in undesirable neighborhoods. Mr. Lopez also helped the mother apply for a housing subsidy and called realtors on her behalf, but the mother made no attempt to find housing other than the apartment hunting in June 2000. The mother gave a slightly different version of events, saying that she and Mr. Lopez looked at apartments only once.
The mother’s experience with BFL was similarly unsuccessful. On July 31, 2000 Mr. Lopez received a letter *36 from BFL saying that they had terminated the mother for lack of attendance. She had missed 9 of 13 counseling sessions.[9]
The mother also missed a meeting at the Salvation Army on May 10, 2000, at which representatives of BFL were present. The mother told the court that she forgot about the meeting. “I forgot because I was going. I had so many appointments concerning domestic violence counseling * * * ” (Transcript, Jan. 25, 2001, at 75, lines 2-3). According to Mr. Lopez Ms. S. missed a meeting scheduled at Keyonna’s school to address the child’s special education needs. The mother first claimed she attended the meeting, but on cross-examination she changed her testimony and said that she missed the meeting, because Mr. Lopez never told her about it. The mother has consistently visited the children, but is often late, sometimes by as much as 45 minutes for a one hour visit. When informed that the time can’t be made up, Ms. S. would occasionally become upset and storm out of the agency to regain her composure. Overall, however, the mother related well to the children during the visits.
When asked about the removal of her children the mother revealed that she believes the foster care placement is unjustified. On cross-examination the mother stated, “I’m depressed because the kids were taken for no reason.” “No reason. Without evidence, interpreters. Just come and take them. Like, you know, I just wondered what was going on. You know, nothing, they just took my kids.” (Transcript, Jan. 25, 2001, at 79-80, lines 24-25, 3-5.)
The most significant discrepancy in the testimony provided by Mr. Lopez and the mother regards the mother’s need for an interpreter. According to Mr. Lopez the mother told him at their initial meeting that she was partially deaf and could understand him if he spoke to her slowly, face-to-face. Still, there were times it was obvious that the mother didn’t understand him. In these instances Mr. Lopez would stop their meeting and schedule a new one so he could have a sign language interpreter present. Mr. Lopez would occasionally employ a noncertified[10] caseworker from the agency. Mr. Lopez reported that an interpreter was present at approximately half *37 the meetings held between Ms. S. and him; however, a certified sign language interpreter attended all of the case conference reviews, which were held every six months.
The mother testified that she told Mr. Lopez in November of 1999 that she couldn’t understand him and requested that a sign language interpreter be present at all meetings. She also said that she couldn’t understand the uncertified sign language interpreters Mr. Lopez used, and that she once refused to participate in a meeting because an uncertified sign language interpreter was present.
Ms. S., however, is clearly less dependent on a sigh language interpreter to communicate than is Mr. R. When answering questions during the fact-finding, for example, the mother would often bypass the interpreter and speak directly to the court. When she was asked about this during her testimony the mother answered, “I use the hearing aid with the help of her. At the same time I use sign language. I do speak, but I use sign language as well.” (Transcript, Jan. 25, 2001, at 46, lines 16-18.)
On another occasion, the mother entered the courtroom while listening to a walkman. When asked about her ability to hear the walkman the mother said, “Loud sounds I do I have a special amplifier on the headset * * * ” (Transcript, Apr. 3, 2001, at b, lines 12-13.)
The mother also testified that she has a high school degree and that she can read and write English. Several letters from Mr. Lopez to the mother were introduced into evidence, in which the mother was encouraged to complete her counseling programs.
The final witness was Ms. Grossinger, who was qualified as an expert in American Sign Language (ASL). She evaluated the father but did not meet with the mother. Ms. Grossinger testified that ASL, as opposed to English, is a visual and gestural language. As a result English and ASL use different syntaxes. To illustrate this point she noted that the phrase “would you like to go out to dinner with me” is translated to ‘You, me, out for dinner?” in ASL (Transcript, June 8, 2001, at 18, lines 16-23). To someone whose first language is ASL, compound sentences, such as “do you like apples, oranges or grapefruits?” wouldn’t be as clear in English as it would be in ASL (Transcript, June 8, 2001, at 39-40, lines 15-25, 1-10). Ms. Grossinger also told the court that communicating or understanding the present, past and future tenses in English would be difficult for someone who primarily speaks ASL.
*38 Ms. Grossinger opined that ASL was the father’s first language. This preference, according to the witness, makes it hard for the father to grasp complex concepts conveyed in English. But she allowed that complex concepts conveyed orally or in writing could be understood by the father, provided that the ideas had been conveyed through ASL at some previous time.
Abandonment Claim
Social Services Law § 384-b (5) (a) provides, in pertinent part, that: “a child is ‘abandoned’ by his parent if such parent evinces an intent to forego his or her parental rights and obligations as manifested by his or her failure to visit the child and communicate with the child or agency, although able to do so and not prevented or discouraged from doing so by the agency.”
The abandonment period is calculated from “six months immediately prior to the date on which the petition is filed in the court * * * ” (Social Services Law § 384-b [4] [b]). In all termination of parental right cases, the agency must prove their case by clear and convincing proof. (See, Social Services Law § 384-b [3] [g].)
The Law Guardian and agency ask that the contacts the father had with the agency and child between March 13, 2000 and September 14, 2000 be deemed incidental contacts that do not interfere with the abandonment. There are abandonment cases where infrequent contacts have been found to be incidental (see, Matter of Female W., 271 AD2d 210 [1st Dept] [telephone call to agency and two contacts with foster parents does not defeat abandonment]; Matter of Richard X., 226 AD2d 762 [3d Dept] [one visit with child was insufficient to defeat abandonment claim where respondent missed several scheduled visits and hadn’t otherwise visited the child in over one year]; Matter of Orange County Dept. of Social Servs. [Christine S.], 203 AD2d 367 [2d Dept] [evidence of one or two contacts with children while mother was incarcerated does not defeat abandonment claim]). The respondents’ overall behavior in the above cases indicated that they lacked sustained interest in their children. In the instant case, however, the father traveled to New York from Michigan at least three times during the abandonment period hoping to visit Keyonna, called the agency on March 13, 2000 and March 31, 2000 and physically appeared at the agency on March 16, 2000. In addition, he left money for *39 Keyonna when visiting her on Easter Sunday 2000.[11] Even if, as the Law Guardian suggests, the father’s visits to New York were motivated by a desire to see the mother, the behavior of the father between March 13, 2000 and September 14, 2000 demonstrates that he had a sincere interest in maintaining a relationship with his daughter. The father’s actions, thus, are sufficient to defeat the abandonment claim.
Permanent Neglect
Social Services Law § 384-b (7) (a) provides, in pertinent part, that a “ ‘permanently neglected child’ shall mean a child who is in the care of an authorized agency and whose parent * * * has failed for a period of more than one year[12] following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency’s diligent efforts to encourage and strengthen the parental relationship * * * ”
Diligent efforts are defined as:
“reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child, including * * *
“(1) consultation and cooperation with the parents in developing a plan for appropriate services to the child and his family * * *
“(5) making suitable arrangements with a correctional facility * * * for an incarcerated parent to visit the child within the correctional facility * * * When the parent is incarcerated in a correctional facility located outside the state, the provisions of this subparagraph shall be construed .to require that an authorized agency make such arrangements with the correctional facility only if reasonably feasible * * * ” (Social Services Law § 384-b [7] [fl).
“[T]he threshold inquiry * * * in any [permanent] neglect proceeding must be whether the agency exercised diligent efforts to strengthen the parental relationship.” (Matter of Star Leslie W., 63 NY2d 136, 142.) In evaluating the sufficiency of *40 the agency’s efforts, the evidence must be seen in the light most favorable to the agency. (Matter of Jessica UU., 174 AD2d 98 [3d Dept].)
The respondents claim that the agency did not exercise diligent efforts because they did not sufficiently accommodate their hearing disabilities. They argue that this failure violated the Americans With Disabilities Act (ADA),[13] and ask the court to find that the ADA applies to the instant proceeding.
The ADA provides “[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity * * * .” (42 USC § 12132.) Deafness is a disability under the ADA. (See, Duffy v Riveland, 98 F3d 447, 454-455 [9th Cir].)
The only New York case to discuss the applicability of the ADA to termination of parental rights proceedings in any depth is Matter of Chance Jahmel B. (187 Misc 2d 626 [Fam Ct, Monroe County]). That case involved a brain injured respondent who claimed that the agency violated the ADA by failing to provide unification services that accommodated his disability. The court concluded that the application of the ADA was a moot issue since New York doesn’t require diligent efforts when mental illness is the grounds for terminating parental rights. But in dicta the court concluded that the ADA is likely inapplicable to termination cases because termination of parental rights proceedings don’t appear to be “services, programs, or activities” as defined by the ADA. That court noted that even if the ADA doesn’t apply to termination proceedings, parents in such cases may still have a cause of action against the agency under the ADA for money damages.
The reasoning of the court in Matter of Chance Jahmel B. mirrors several out-of-state courts which have declined to apply the ADA to termination of parental rights proceedings, because they are not services, programs or activities in accordance with the ADA.[14] Other foreign courts faced with a claim that the state violated the ADA found that sufficient accommodations were made for the parents’ disabilities, without addressing whether the ADA applies to termination of parental *41 rights proceedings.[15] There are no reported cases in which a termination of parental rights petition was dismissed for failure to provide services that conform to the ADA. However, a Texas court, while rejecting an ADA defense on procedural grounds, suggested that the ADA might apply to termination proceedings.[16] And an Indiana court in the case of Stone v Daviess County Div. of Children & Family Servs. (656 NE2d 824 [Ind 1995]) rejected an ADA defense because Indiana does not require unification efforts, but stated that if Indiana required such efforts they would have to comply with ADA standards. The reasoning of the Stone v Daviess court is that the state statute would be preempted by the ADA under the US Constitution’s Supremacy Clause. Since, however, there was no Indiana statute in conflict with the ADA, the court opined that the Supremacy Clause is inapplicable.
In In Interest of Torrance P. (187 Wis 2d 10, 522 NW2d 243 [1994]) a Wisconsin court saw the interplay between the ADA and state termination of parental rights statutes differently than did the Stone v Daviess court. The respondent in In Interest of Torrance P. was a developmentally disabled father whose parental rights were terminated. He appealed to the Wisconsin Court of Appeals, and argued that the agency violated the ADA. Declaring that the ADA doesn’t “change the obligations imposed by unrelated statutes” (In Interest of Torrance P., supra, 187 Wis 2d at 16, 522 NW2d at 246), the Torrance P. court looked to Wisconsin’s state statute, which required that the agency exercise diligent efforts, to determine whether the state had fulfilled its obligation.
Overall, the Stone v Daviess decision is unpersuasive because the ADA was designed to deal with access to public services and accommodations, rather than to alter the rights of parents in state termination of parental rights statutes. In other words “nothing in the ADA suggests that denial of TPR * * * is an appropriate remedy for an ADA violation.” (State in Interest of B.K.F., 704 So 2d 314, 317 [La 1997].) While a respondent in a termination of parental rights case might be able to sue for money damages under the ADA, the dismissal of a termination of parental rights petition is not a remedy under the act.
In any event, this court, following the reasoning put forth in Matter of Chance Jahmel B., concludes that termination of *42 parental rights proceedings are not “services, programs, or activities” as defined by the ADA.
In evaluating whether the agency has exercised diligent efforts, the court found only one New York termination of parental rights case that addressed an agency’s efforts regarding a hearing impaired respondent. In Matter of Shaquanna C. (184 AD2d 509 [2d Dept]), the Appellate Division upheld a finding of diligent efforts where the “agency * * * provided the hearing-impaired mother with sign-language interpreters at meetings with social workers, informed the mother of the necessary steps for the return of the children, and arranged for the mother to attend counseling, psychotherapy, and parent training sessions * * * at institutes which provide such assistance to the hearing impaired.” (Matter of Shaquanna C., supra at 510.) New York courts have also determined that special accommodations for disabled parents need only be provided if the parent asks to be accommodated (see, Matter of Jowell Lateefra B., 271 AD2d 366 [1st Dept] [a finding of diligent efforts regarding a blind father in a termination of parental rights case is upheld because the respondent never asked for special accommodations for visits with the child and the subject child’s mother accompanied the father to the visits and acted as a guide]).
Given the paucity of precedent regarding hearing impaired parents in termination of parental rights cases, the ADA guidelines concerning the hearing impaired can be helpful in supplementing the principles established pursuant to New York’s diligent efforts standard. In In re Antony B. (54 Conn App 463, 735 A2d 893) a Connecticut court even suggested that Connecticut’s “reasonable efforts” standard and the ADA have equivalent requirements. After rejecting a parent’s claim that the ADA applies to termination of parental rights proceedings that court noted, “A failure to provide adequate services because of the patient’s mental condition would violate not only [Connecticut’s TPR statute] but the ADA.” (In re Antony B., supra, 54 Conn App at 473 n 9, 735 A2d at 899 n 9.)
The parallel drawn in In re Antony B. between “reasonable efforts” and the ADA applies to “diligent efforts” as well. Several New York courts, for instance, have used the terms “reasonable efforts” and “diligent efforts” interchangeably.[17] In addition, “[t]he statute requires only reasonable efforts * * * ” *43 (Matter of Star Leslie W., supra, 63 NY2d 136, 144; see, Social Services Law § 384-b [7] [f]). The court, thus, will look to the ADA for guidance in evaluating the agency’s efforts in this case.
The ADA allows public entities serving hearing impaired individuals to utilize a broad range of communication aids. They include “[qlualified interpreters, notetakers, transcription services, written materials, telephone headset amplifiers, as-sistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD’s), videotex displays, or other effective methods * * * ” (28 CFR 35.104 [1]).
What constitutes effective communication under the ADA is a question of fact (see, Bravin v Mount Sinai Med. Ctr., 186 FRD 293, 301). A sign language interpreter need not be certified, for example, so long as the interpreter can be understood (see, Duffy v Riveland, 98 F3d 447, supra). And like the application of diligent efforts to disabled parents in New York (see, Matter of Lateefra B., 271 AD2d 366), federal courts have ruled that special accommodations for deaf people need only be provided when they are requested (see, Soto v City of Newark, 72 F Supp 2d 489 [D NJ]). Furthermore, the types of services required is dependent upon the extent of the hearing impairment. In Matter of Nicholas M. (189 Misc 2d 318 [Fam Ct, Onondaga County]), a hearing impaired respondent in an article 3 extension of placement case claimed that the state had violated the ADA because his sex offender’s counseling was relayed through an interpreter, as opposed to being provided by a therapist who communicated in sign language. The court found that there was no ADA violation because the respondent presented no evidence that his therapy was hindered by the arrangement and because the respondent could read lips and did well in a mainstream school.
Applying the aforementioned principles to the case at bar, this court concludes that the agency exercised diligent efforts to encourage a meaningful relationship between the respondents and their children.
Ms. S. claims that she failed to comply with the agency’s unification plan because her hearing impairment prevented her from understanding what was expected from her. According to the mother, the agency was required to provide a certified sign language interpreter for every meeting she had with Mr. Lopez, and their failure to do so made it impossible for her *44 to communicate with Mr. Lopez. These assertions have no merit.
While the mother testified that she told Mr. Lopez that she needed a sign language interpreter to communicate with him, it was clear to this court, as evidenced by her practice of bypassing the sign language interpreter during testimony, that Ms. S. could, in fact, effectively communicate without an ASL interpreter. The court, thus, credits Mr. Lopez’s testimony that the mother told him that she could communicate without the help of a sign language interpreter.
Nevertheless, the agency effectively communicated to the mother what was required of her to be reunited with her children. The mother’s progress was discussed at the case conferences held every six months, where certified sign language interpreters were present, as well as other conferences attended by sign language interpreters. Although some of these sign language interpreters were uncertified, there is no requirement that they be so. Furthermore, the mother — who was able to read and write — received numerous letters explaining what was required of her. The court order issued at the 1998 extension of placement proceeding was read to her in court by a sign language interpreter and she was provided a copy of that order.
The most persuasive evidence that the mother understood what was expected of her is that she participated in programs at BFL and BISL. These programs specialized in serving hearing impaired clients, and provided services that addressed domestic violence and housing issues. Ms. S. failed to take advantage of their services, and never completed any of the programs to which she was referred.
Ms. S. was given numerous chances to remedy the problems which caused the children to be in foster care. Like the agency in Matter of Shaquanna C. (supra), the agency in the case at bar provided sign language interpreters at case conferences and referred the mother to agencies that accommodated the hearing impaired. Yet, in addition to jettisoning her opportunities at BFL and BISL, the mother failed to get any of the tests or evaluations requested of her,[18] was constantly late for visits with the children, and missed casework meetings. For the forgoing reasons I find that the mother has failed to plan for the future of the subject children for a period of more than one *45 year, despite the diligent efforts of the agency to assist her in doing so.
According to the father, the agency failed to exercise diligent efforts because they did nothing to locate him when he was imprisoned. Mr. R. also asserts that he was unable to maintain contact with Keyonna while he was in jail because the prison failed to sufficiently accommodate his disability.
The agency’s responsibility regarding incarcerated parents was addressed in two First Department cases, Matter of Sasha R. (246 AD2d 1) and Matter of Shakim Ravon B. (257 AD2d 547). In Sasha R. the Family Court dismissed a permanent neglect petition because the agency didn’t locate the father even though he told the agency he was incarcerated. In reversing the Family Court, the Appellate Division ruled that “[t]he Family Court erroneously found that simply because respondent told the agency he was incarcerated, the agency had the means to communicate with him.” (Matter of Sasha R., supra at 5.) The Court went on to note that the respondent had several aliases and that the agency didn’t know what crime he was convicted of, his prison identification number, or his date of conviction. The Court concluded that it was the respondent’s responsibility to tell the agency where he was, and could have done so by phone or mail.
In Matter of Shakim Ravon B., an abandonment case, the First Department again relieved the agency of the obligation to track down an incarcerated father. “There is no merit to respondent’s argument that the agency, having been advised by his sister during the abandonment period, if not before, of his whereabouts in prison, was obligated to contact him and initiate efforts to encourage his parental relationship with his child.” (Shakim Ravon B., supra at 548.)
Like the agency in Sasha R., the agency in the instant matter did not know the crime the respondent was convicted of, his date of conviction or his prison identification number. While the respondent’s probation officer in Michigan might have been helpful in tracking down the father, the agency’s task was complicated by having to deal with an out-of-state prison system.
Mr. R., however, was still obligated to plan for his child. “While incarceration is not a ground in and of itself for termination of parental rights, an incarcerated parent is not excused from the requirement that he or she realistically plan for his/ her child’s future.” (Matter of Jayson M., 177 AD2d 396, 396; see, Matter of Gregory B. v Gregory F., 74 NY2d 77.)
*46 This duty is applicable even to incarcerated parents with limited communication skills. In Matter of Stella B. (130 Misc 2d 148 [Fam Ct, Onondaga County]) the respondent claimed he was prohibited from communicating with the agency and child because he was illiterate. The court disagreed. “While he may have been prevented by his illiteracy from writing to the child, it is not self-evident that this condition precluded all other forms of communication with the child, even under the constraints imposed by his incarceration * * * ” (Matter of Stella B., supra at 149).
The respondent father’s argument that his incarceration prohibited him from communicating with the child or agency is similar to the argument made by the incarcerated father in Matter of Stephanie N. (245 AD2d 74 [1st Dept]). The appellate court was unpersuaded by this line of reasoning, ruling that “Respondent’s claim that his incarceration prevented him from communicating with the children and agency * * * is contradicted by his admissions that he knew the agency’s name, was able to make telephone calls while in jail, and had in fact called other members of his family.” (Matter of Stephanie N., supra at 74.)
In the case at bar, Mr. R. knew the agency’s name, had access to a telephone, and used it to call a family member in New York. In addition, by giving the father access to a TDY machine the prison accommodated him within the confines of the ADA (see, Spurlock v Simmons, 88 F Supp 2d 1189 [prison that allowed deaf inmate to use TDY machine twice weekly was in compliance with the ADA]). It is also significant that Mr. R. chose not to contact the agency for almost five months after his release from prison.
Most revealing of the father’s lack of interest in regaining custody of Keyonna is his decision to live in Michigan.[19] The father must have known that living so far away would add to the obstacles imposed by his disability. Mr. R.’s choice to live out of state, his failure to complete an alcohol rehabilitation or domestic violence program, and his failure to apprize the agency of his whereabouts while in prison and for the five months after his release, demonstrate that he was not interested in regaining custody of Keyonna, nor did he provide any other permanency plan for the child.
*47 The agency did everything that they could reasonably be expected to do given the father’s lack of cooperation. (See, Matter of Dimitris W., 276 AD2d 845 [3d Dept].) “The agency is ‘not charged with a guarantee that the parent succeed in overcoming his or her predicaments. Indeed, an agency that has embarked on a diligent course but faces an utterly un-co-operative or indifferent parent should nevertheless be deemed to have fulfilled its duty.’ ” (Matter of Jamie M., 63 NY2d 388, 393, quoting Matter of Sheila G., 61 NY2d 368, 385.)
The court recognizes that the difficulty of expressing the future, past and present tenses in English to a person who primarily communicates in ASL, might have made it difficult for Mr. R. to understand Mr. Lopez regarding the need to give advance notice of his trips to New York. Otherwise the testimony of the sign language expert cast no doubt on the respondents’ ability to understand Mr. Lopez. Even though the difference in syntax between American Sign Language and English may affect a hearing impaired person’s comprehension of abstract concepts conveyed orally or in writing, the need to be tested for drugs, obtain housing, go for a psychological evaluation, or refrain from domestic violence are straightforward enough requests to be understood by someone with a rudimentary understanding of English.
Both respondents were clearly unreceptive to the service referrals made by the caseworker, and each parent believed that the children were removed from their care without cause. The respondents’ refusal to take responsibility for their shortcomings made the caseworker’s task in referring the parents for services even more difficult. (See, Matter of Adrian M., 270 AD2d 93 [1st Dept]; Matter of Jessica Lynn W., 244 AD2d 900 [4th Dept]; Matter of Chianti FF., 205 AD2d 849 [3d Dept] [cases which say that parents’ lack of cooperation can’t be blamed on the agency].)
For all of the reasons stated herein, the court finds by clear and convincing evidence that the agency has sustained their causes of action for permanent neglect against both respondents. The cause of action for abandonment against the respondent father is dismissed.

. The children are in a nonkinship foster home.

. It is unclear from the father’s testimony as to why he did not enroll in a domestic violence program. At first he said there was a long waiting list, then he testified that he wanted to complete the alcohol rehabilitation program first.

. It was unclear from the testimony what the father’s conviction was for, although it was related to domestic violence.

. On direct examination the father said he contacted the agency in mid-July 1999 and arranged a visit with Keyonna. But on cross-examination the father testified that after leaving prison he first contacted the agency in October 1999. The father’s recollection on cross-examination corresponds with Mr. Lopez’s case record.

. It was the caseworker’s practice to have the foster parent and father arrange for visitation directly between themselves, given the routinely short notice of visitation by the father.

. Mr. Lopez found it effective to leave messages for the respondent father with the grandfather, since the father and grandfather were in frequent communication with one another.

. Judge Jurow’s order of August 3, 1998 specified that the agency was not responsible for the respondent’s travel expenses, but the agency sometimes reimbursed the father anyway.

. There was no testimony, however, about whether the father sent cards to Keyonna during this period.

. All together 16 sessions had been scheduled, but BFL cancelled three of them. The only program the mother had success at was a parenting skills course, which she completed in 1997.

. A sign language interpreter becomes “certified” upon passing evaluations given by the Registry of Interpreters for the Deaf, a national organization.

. The money transfers entered into evidence by the respondent will not be credited by this court as child support payments as they were made out to the mother at a time period she did not have custody of the children.

. The one year period may be any consecutive one year period during the placement period. (See, Matter of Star Leslie W., 63 NY2d 136.)

. The ADA is federal legislation which requires public entities or private entities receiving federal assistance to make reasonable accommodations for persons with disabilities.

. State in Interest of B.K.F., 704 So 2d 314 (La 1997); In re Antony B., 54 Conn App 463, 735 A2d 893 (1999); In re B.S., 166 Vt 345, 693 A2d 716 (1997); In re Adoption of Gregory, 434 Mass 117, 747 NE2d 120 (2001).

. In re Angel B., 659 A2d 277 (Me 1995); In Interest of C.M., 526 NW2d 562 (Iowa 1994); In re Welfare of A.J.R., 78 Wash App 222, 896 P2d 1298.

. In re C.M., 996 SW2d 269 (Tex 1999).

. Matter of Latasha W., 268 AD2d 340 (1st Dept); Matter of Francois Jean B., 200 AD2d 524 (1st Dept); Matter of Jason Anthony S., 277 AD2d 389 (2d Dept).

. See, Matter of John ZZ., 192 AD2d 761 (3d Dept); Matter of Female J., 202 AD2d 340 (1st Dept); Matter of Tasha Monica B., 156 AD2d 247 (1st Dept) (cases where permanent neglect was found, in part, because parents refused to get psychological evaluations).

. Commuting difficulties have been held to be an inadequate excuse for a failure to visit. (See, Matter of G., 79 Misc 2d 731 [Sur Ct, NY County], revd on other grounds 51 AD2d 282 [1st Dept].)