58 P.3d 78

**In the Interest of Jane DOE, Born on February 2, 1999, Minor.**

**No. 24348.**

Intermediate Court of Appeals of Hawai'i.

Oct. 18, 2002.

---

Jeffry R. Buchli, Honolulu, on the briefs, for mother-appellant.

Carl F. Debo, Honolulu, on the briefs, for father-appellant.

David McCormick, Jay K. Goss, and Mary Anne Magnier, Deputy Attorneys General, State of Hawai'i, on the briefs, for Department of Human Services-appellee.

WATANABE, Acting C.J., LIM, and FOLEY, JJ.

Opinion of the Court by WATANABE, J.

These appeals by Mother and Father[1] (collectively, Parents) stem from a termination of parental rights (TPR) proceeding in which the Family Court of the First Circuit (the family court) terminated Parents' parental rights in their daughter, Jane Doe (Daughter), and awarded permanent custody of Daughter to the Department of Human Services, State of Hawai'i (DHS). The family court determined that although Parents clearly loved Daughter, they were incapable, due to their mental and cognitive deficiencies,[2] of raising her in a safe family home.

The legal issue of first impression that we must decide[3] is whether the family court's termination of Parents' parental rights violated Parents' rights under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.

Concluding that no violation occurred, we affirm the Order Awarding Permanent Custody, entered by the family court[4] on January 22, 2001, and the Orders Concerning Child Protective Act, entered by the family court[5] on May 24, 2001, from which these appeals were taken.

## BACKGROUND

Daughter was born on February 2, 1999. Because Parents had yelled at each other in the labor and delivery room and exhibited limited mental capacity and reasoning, hospital staff became concerned for Daughter's safety and reported their concerns to DHS. After evaluating the situation, DHS allowed Daughter to go home with Parents on February 6, 1999, premised on the understanding that Mother's sister-in-law would assist in caring for Daughter.

Following Daughter's discharge from the hospital, DHS arranged for a variety of services to be provided to Parents so they could learn how to appropriately care for Daughter. On October 26, 1999, police removed Daughter from Parents' residence, placed her in protective custody, and released her to DHS, which placed her in a DHS foster home "due to threatened harm and/or ne-

1. Mother and Father (collectively, Parents) were not married during the proceedings below. However, they lived together, Father has never denied that he is the natural father of Jane Doe (Daughter), and Father is named on Daughter's birth certificate as Daughter's father.

2. Dr. Tom Loomis, a psychologist, testified that his tests showed Mother to be mildly mentally retarded, with an intelligence quotient (IQ) of between 55 and 69, and Father to have "borderline intellectual functioning[,]" with an IQ of between 70 and 79.

3. Parents also allege that the Family Court of the First Circuit (the family court) clearly erred in entering numerous findings of fact that formed the bases for the family court's conclusions of law that (1) neither Mother nor Father was willing and able to provide Daughter with a safe family home, even with the assistance of a service plan; (2) it was not reasonably foreseeable that Parents will become willing and able to provide Daughter with a safe family home, even with the assistance of a service plan, within a reasonable period of time; (3) the Americans with Disabilities Act (ADA) is not a defense to a

termination of parental rights (TPR); and (4) the Permanent Plan dated September 27, 2000 is in Daughter's best interests. Our review of the record, however, indicates that substantial evidence was adduced to support the challenged findings of fact. See In re Doe, 95 Hawai'i 183, 196, 20 P.3d 616, 629–30 (2001) (holding that in reviewing whether the "record contains 'substantial evidence' supporting the family court's determinations," an appellate court is "limited to assessing whether those determinations are supported by 'credible evidence of sufficient quality and probative value[,]'" and "the testimony of a single witness, if found by the trier of fact to have been credible, will suffice."). (Citation omitted).

4. The Honorable Karen M. Radius (Judge Radius) entered the Order Awarding Permanent Custody.

5. Judge Radius signed the Orders Concerning Child Protective Act "for [Judge] Marilyn Carlsmith."

glect by [Parents]." Three days later, DHS filed a Petition for Temporary Foster Custody of Daughter, alleging that there was "a reasonable foreseeable substantial risk that harm may occur to [Daughter] based upon an assessment of the criteria set forth in HRS [§ ] 587–25 [ (1993).]."[6] Among the grounds mentioned by DHS in its petition were the following: (1) "On or about October 24, 1999, Mother threw a rock at Father, who was holding [Daughter] at the time"; (2) "[w]hile Mother was in the labor and delivery room, Father was heard swearing because her cries of pain kept him from sleeping"; (3) despite home-based and other services provided to Parents that focused on parenting skills, child development, anger management, conflict resolution, budgeting, and independent housing, Parents were still struggling with independent living, Mother's anger management problem, "conflicts [that] occasionally erupt into physical altercations[,]" and pro-

viding a safe home for Daughter; (4) despite assistance from Healthy Start, Parents were unable to maintain a sanitary living environment for Daughter, since Parents' home was observed with "rubbish," "mud, dust, dirty diapers, and clothing on the floors," "no food or diapers[,]" "virtually no furniture" so that Daughter had to sleep "on the tile floor with no cushion or mattress[,]" "beer cans outside the door[,]" and there was "an odor that made one service [worker] sick to her stomach)"; (5) "[b]oth [P]arents are diagnosed as mildly mentally retarded[,]" "have been seeing psychiatrist DAN MOTET for depression and both are prescribed Zoloft[,]" and "Father was in an automobile accident about 10 years ago, has a shunt in his head, and walks with a limp"; (6) "[Parents] are unemployed and receiving welfare benefits"; (7) "[Parents'] mental health limitations, inability to maintain a clean home even with frequent

---

6. Hawai'i Revised Statutes (HRS) § 587–25 (1993) provides:

> **Safe family home guidelines.** (a) The following guidelines shall be fully considered when determining whether the child's family is willing and able to provide the child with a safe family home:
> (1) The current facts relating to the child which include:
> (A) Age and vulnerability;
> (B) Psychological, medical and dental needs;
> (C) Peer and family relationships and bonding abilities;
> (D) Developmental growth and schooling;
> (E) Current living situation;
> (F) Fear of being in the family home; and
> (G) Services provided the child;
> (2) The initial and any subsequent reports of harm and/or threatened harm suffered by the child;
> (3) Date(s) and reason for child's placement out of the home, description, appropriateness, and location of the placement and who has placement responsibility;
> (4) Historical facts relating to the alleged perpetrator and other appropriate family members who are parties which include:
> (A) Birthplace and family of origin;
> (B) How they were parented;
> (C) Marital/relationship history; and
> (D) Prior involvement in services;
> (5) The results of psychiatric/psychological/developmental evaluations of the child, the alleged perpetrator and other appropriate family members who are parties;
> (6) Whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the family home;

> (7) Whether there is a history of substance abuse by the child's family or others who have access to the family home;
> (8) Whether the alleged perpetrator(s) has acknowledged and apologized for the harm;
> (9) Whether the non-perpetrator(s) who resides in the family home has demonstrated the ability to protect the child from further harm and to insure that any current protective orders are enforced;
> (10) Whether there is a support system of extended family and/or friends available to the child's family;
> (11) Whether the child's family has demonstrated an understanding and utilization of the recommended/court ordered services designated to effectuate a safe home for the child;
> (12) Whether the child's family has resolved or can resolve the identified safety issues in the family home within a reasonable period of time;
> (13) Whether the child's family has demonstrated the ability to understand and adequately parent the child especially in the areas of communication, nurturing, child development, perception of the child and meeting the child's physical and emotional needs; and
> (14) Assessment (to include the demonstrated ability of the child's family to provide a safe family home for the child) and recommendation.
> (b) The court shall consider the likelihood that the current situation presented by the guidelines set forth in subsection (a) will continue in the reasonably foreseeable future and the likelihood that the court will receive timely notice of any change or changes in the family's willingness and ability to provide the child with a safe family home.

monitoring by service providers, the difficulty [Parents] are experiencing with independent living, Mother's anger management problem, and [Daughter's] vulnerability due to her young age constitutes [sic] threatened harm to [Daughter]"; and (8) "DHS knows of no other Hawai'i family members other [sic] types of support to [Daughter]."

On November 2, 1999, DHS's Petition for Temporary Foster Custody was heard before Judge Karen M. Radius (Judge Radius). DHS introduced into evidence four exhibits, which documented the history of DHS's involvement with Parents and Daughter, assessed Parents' abilities to protect Daughter and maintain a safe family home, and summarized the concerns and observations of various social service providers. Following the hearing, Judge Radius entered an Order Concerning Child Protective Act, which, among other things: determined that the family court had exclusive jurisdiction over Daughter and Parents; ordered the award of foster custody of Daughter to DHS; incorporated as part of the order, the terms and conditions of an October 28, 1999 service plan "designed to help the family address and resolve the safety issues identified by DHS"; ordered the parties to appear for a review hearing on January 27, 2000; and ordered DHS and Daughter's guardian ad litem (GAL) to submit reports prior to the review hearing date.

On January 13, 2000, DHS submitted to the family court a revised Family Service Plan. At a January 27, 2000 review hearing, DHS and Parents agreed to comply with this revised service plan, which required Mother and Father to: (1) get psychiatric treatment focusing on depression; (2) undergo anger management and domestic violence counseling; and (3) receive home-based counseling and parenting skills focused on child development and needs, bonding and attachment, discipline, maintaining a safe and clean home, relationship issues, coping skills, and communication.

Also on January 13, 2000, DHS social worker Margaretha M. Lum (Lum) submitted to the family court a confidential Supplemental Safe Family Home Report, summarizing DHS's efforts to engage Parents in services and recommending the continuation of DHS foster custody of Daughter. Lum's report noted that Parents "appear to be *willing* to resolve the safety issues[,] ... have participated with court ordered services and seem to be trying very hard to comply with every aspect of the service plan." (Emphasis in original.) Additionally, Parents share a "genuine love of [Daughter and] a willingness to work with the system and follow through with recommendations" and Mother has also "proved to be quite resourceful in finding resources in the community[, which] seems to be the result of the many efforts made by previous service providers, ... indicat[ing] that [Mother] has the ability to learn new skills."

Despite these positive qualities, Lum recommended continued DHS foster custody of Daughter "until it can be determined that there are no other responsible adults willing to assist [Parents]" because

> [Parents] are unable now or in the foreseeable future to maintain a safe home due to their limited capacity to understand exactly what it entails to provide a **safe** home. In addition, [Parents] appear to have a limited understanding of the needs of a one year old.
>
> . . . .
>
> Both [Parents] appear to be functioning in the mildly retarded range of intellectual functioning. They seem to have many limitations, through no fault of their own. Although it seems highly unlikely that they will ever be able to raise a child on their own, it seems possible that they may be able to parent their child as long as there is a responsible adult in the home. In all fairness to them, this needs to be further explored[.]

(Bolded emphasis in original.) Lum cited the following example of Parents' limited understanding of the needs of a one-year old:

> [Daughter], who is at the early stages of walking, was stumbling around some bookshelves in the visitation room and looked like she was loosing [sic] her balance. Neither parent stood up to prevent her from falling and possibly hitting her head. When instructed by the [Social Service Assistant] to assist [Daughter] be-

cause she might fall, [Mother] replied "that is okay, she falls all the time."

Lum's report also noted that "[b]oth Dr. [Tom] Loomis [ (Dr. Loomis) ] and Dr. Motet stated that [Parents] have many personal problems and are needy individuals, who have limited insight into the needs of a baby. Both Dr. Loomis and Dr. Motet recommended that a responsible adult be in the home at all times to ensure the safety of [Daughter] if and when [Daughter] is returned to the home." According to Lum, Mother suggested an acquaintance known only as "Willie" as someone who might qualify as a "responsible adult" to supervise their home. Lum planned to interview Willie, as well as a paternal aunt who lived on the mainland and was interested in helping Parents reunify with Daughter, to assess whether either would be able to take full-time responsibility for Daughter's safety.

In a report filed on January 20, 2000, Daughter's GAL also recommended "continued foster placement until it can be shown that [P]arents have completed their services."

At the January 27, 2000 hearing before the family court, Judge Paul T. Murakami presiding, DHS informed the family court that DHS had not been able to locate "appropriate adult supervisors who would be in the home on a full-time basis to help [P]arents take care of the children." An individual whose name had been submitted by Parents as a possibility apparently had been disqualified because of a prior criminal record which involved sex abuse. Following the hearing, the family court entered an order that, among other things, continued Daughter in foster custody, incorporated the January 13, 2000 service plan as part of the order, and ordered the parties to appear for a review hearing on July 13, 2000.

At the July 13, 2000 review hearing before Judge Radius, the family court received from Lum a report dated June 29, 2000, stating that Parents had complied with all services but were still unable to provide Daughter with a safe family home. Lum recommended that foster custody be continued and apprised the family court that DHS "will start permanency proceedings immediately." The family court also received into evidence a status report, dated June 28, 2000, prepared by the Comprehensive Counseling and Support Services Program of Child and Family Service (CFS), which had been contracted by DHS to provide outreach services to Parents. The report described Parents as "very affectionate towards [Daughter]" and diligent about keeping all of their scheduled home visits but still deficient in the areas of safety and discipline. The report noted:

> The home has been observed to be unsafe for [Daughter]. [Parents] have removed extension cords that were lying on the floor in the living room. They expressed that they have attempted to make the home cleaner and safe, but have been unsuccessful. The home has continued to be without electricity, due to an unpaid bill by roommates.... Their bedroom continues to be messy with laundry and trash, even after [Mother] stated that she cleaned it on the weekend. Their home does not allow pets, but they continue to keep a bird that they found in a cage. It has been observed that bird droppings and bread are all over the bedroom floor. They also have a pit bull puppy in the home, which they say belongs to [Daughter]. [Mother] continues to tell me she understands what needs to be done in the home to make it safer, but has not taken the initiative to do so.
>
> In summary, [Parents] could have the ability to understand and follow through in parenting [Daughter] and having a safe home, but only with the help and close guidance of someone responsible living in the home with them. They have been unsuccessful in finding a responsible person.

The family court also entered into evidence a DHS Safe Family Home Report, dated July 11, 2000 and authored by Lum. In it, Lum covered many of the same issues contained in her January 13, 2000 report but included the following additional information: (1) all of the individuals suggested by Mother as responsible adults were deemed inappropriate because of checkered pasts, including incarceration for a sex offense, arrests for abuse of a household member, and rumors of

drug dealing; (2) Parents do not have a viable support system, since extended family members are either unable or unwilling to help out; (3) Father has previously used both marijuana and crystal methamphetamine, although he has since stopped; (4) on June 2, 2000, psychologist Dr. Jerry Brennan concluded that it was unlikely that Parents would be able to adequately care for Daughter; and (5) in DHS's view, Parents are not able to make the required changes to provide a safe home for Daughter and cannot provide for Daughter's physical and emotional needs. The report concluded that, given Parents' lack of progress in providing a safe home for Daughter, their lack of a "viable support system" and their inability "to take care of their own needs, which is mainly due to their own cognitive limitations[,]" "[r]eunification with either parent no longer appears to be a realistic goal" and it was in the best interests of Daughter that she be adopted as soon as possible.

Also received into evidence was a report of the GAL, filed on July 7, 2000, which noted that Daughter was bonded to her foster family and was "a loving active baby girl who needs a lot of attention and supervision when cared for." The GAL recommended that Daughter be continued in foster custody and stated that "if [Parents] cannot find an appropriate adult to live with them, it is highly unlikely that they would be able to care for themselves adequately together with [Daughter]."

During the July 13, 2000 hearing, Judge Radius asked if any residential assistance programs accepted people with children. Father's attorney responded that he and Mother's attorney needed to check into that possibility. Father's attorney also noted that he was aware of a mother and child who participated in such a program, and that it was successful enough for DHS's Child Protective Services Unit to "close that case[.]" Father's attorney continued: "[I]ntuitively it makes sense that . . . there would be either an assisted living [program] or like a care home[-]type situation that the family would qualify for." Mother's attorney agreed, adding, "[T]here's got to be something out there . . . for these people . . . because you just

don't take their kids away because . . . they're disabled."

By an order dated July 14, 2000, Daughter was continued in foster custody, the July 11, 2000 service plan was incorporated as part of the order, and a further review hearing was scheduled for November 30, 2000.

On October 18, 2000, DHS moved forward with its plan to facilitate Daughter's adoption by filing a Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan. At the October 31, 2000 hearing on the motion, the family court received from Lorraleen Au of CFS, a quarterly status report dated September 29, 2000, which provided the following assessment of Parents' parenting skills and the safety of their home:

> [Parents] have kept all scheduled home visits. The home continues to be unclean, even after [Mother] stated that she cleaned the house. Bedroom continues to smell, with animals living in cages. Parents are unable to focus on parenting skills and [Daughter] due to neighbors, friends, and their animals always coming into the home. Play needs to be continuously encouraged or [P]arents will gossip and sit on sofa without interacting with [Daughter]. Parents do talk a lot to [Daughter] and makes [sic] [Daughter] laugh. Parents are unaware of safety issues when neighbor's dog comes into the house and around [Daughter] and [Daughter] cries. Both [P]arents appear to be receptive to parenting information discussed during home visits. Prior to roommates moving out, [P]arents and roommate were yelling at each other in front of [Daughter] during August 8 home visit. Due to unsafe home conditions and the need for a more structured environment during visits, this family was referred to the [Parent and Children Together (PACT) ] Visitation Center. Outreach/Home Visits were cancelled when family started receiving services from PACT.

At the October 31, 2000 review hearing, both Mother and Father "strenuously object[ed]" to Daughter's adoption and requested a trial. Mother argued that she was a "special needs person and that DHS has not done anything to attempt to accommodate her special

needs." Father adopted the same position. After ordering Parents to submit memoranda on the issue of whether the ADA was applicable to this case, Judge Radius set trial for January 9, 2001.

On November 20, 2000, the GAL filed a third report with the family court, recommending that foster custody of Daughter be continued and that the permanency trial set for January 9, 2001 proceed.

A one-day trial was held on January 11, 2001, and on January 22, 2001, the family court, Judge Radius presiding, entered an Order Awarding Permanent Custody of Daughter to DHS. Among other things, this order: revoked the existing service plan and the prior award of foster custody; divested Parents of their "parental and custodial duties and rights" in Daughter; appointed the DHS Director as Daughter's permanent custodian until Daughter reached the age of eighteen or was adopted; incorporated as part of the Order, a Permanent Plan, dated September 27, 2000, calling for DHS to be the permanent custodian of Daughter until appropriate adopting parents could be found; directed that DHS consider Father's brother as a prospective adoptive placement; and ordered the parties to appear at a permanent plan review hearing on March 23, 2001. The family court specifically found by "clear and convincing evidence" that: Parents were "not presently willing and able to provide [Daugh-

ter] with a safe family home, even with the assistance of a service plan"; it was not reasonably foreseeable that Parents "will become willing and able to provide [Daughter] with a safe family home, even with the assistance of a service plan, within a reasonable period of time"; and Parents had "subjected [Daughter] to harm and/or threatened harm and continues to subject [Daughter] to harm and/or threatened harm[.]" The family court also concluded:

> The court does not read the [ADA] as a defense to the [TPR] and if the court were to interpret the Act as [Parents] requested, [DHS] would be required to provide shelter homes for all disabled individuals.

On February 7, 2001 and February 9, 2001, respectively, Father and Mother filed timely HRS § 571–54 (1993) [7] motions for reconsideration of the Order Awarding Permanent Custody. An order denying the motions for reconsideration was entered on May 24, 2001. Notices of appeal by Mother and Father were then filed in a timely manner on June 12, 2001 and June 18, 2001, respectively.

## DISCUSSION

■ The portion of the ADA upon which Parents rely in arguing that their parental rights were improperly terminated is 42 U.S.C. § 12132 (1997), which is part of Title II of the ADA.[8] That section provides:

---

7. HRS § 571–54 (1993) provides, in relevant part:

> An order or decree entered in a proceeding based upon section 571–11(1), (2), (6), or (9) shall be subject to appeal to the supreme court only as follows:
>
> Within twenty days from the date of the entry of any such order or decree, any party directly affected thereby may file a motion for a reconsideration of the facts involved. The motion and any supporting affidavit shall set forth the grounds on which a reconsideration is requested and shall be sworn to by the movant or the movant's representative. The judge shall hold a hearing on the motion, affording to all parties concerned the full right of representation by counsel and presentation of relevant evidence. The findings of the judge upon the hearing of the motion and the judge's determination and disposition of the case thereafter, and any decision, judgment, order, or decree affecting the child and entered as a result of the hearing on the motion shall be set forth in writing and signed by the judge. Any

party deeming oneself aggrieved by any such findings, judgment, order, or decree shall have the right to appeal therefrom to the supreme court upon the same terms and conditions as in other cases in the circuit court and review shall be governed by chapter 602; provided that no such motion for reconsideration shall operate as a stay of any such findings, judgment, order, or decree unless the judge of the family court so orders; provided further that no informality or technical irregularity in the proceedings prior to the hearing on the motion for reconsideration shall constitute grounds for the reversal of any such findings, judgment, order, or decree by the appellate court.

8. The ADA contains four substantive titles: Title I (42 U.S.C. §§ 12111–12117), which relates to employment; Title II (42 U.S.C. §§ 12131–12165), which relates to public services provided by state and local governments; Title III (42 U.S.C. §§ 12181–12189), which relates to public accommodations and services operated by private entities; and Title IV (47 U.S.C. §§ 225,

Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

To establish a violation of Title II of the ADA, an individual must prove three elements:

(1) he [or she] is a "qualified individual with a disability"; (2) he [or she] was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) *such exclusion, denial of benefits, or discrimination was by reason of his [or her] disability.*

*Weinreich v. Los Angeles County Metro. Transp. Auth.,* 114 F.3d 976, 978 (9th Cir. 1997) (emphasis in original). A "qualified individual with a disability" is defined in 42 U.S.C. § 12131(2) (1997) as

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

The term "disability" is defined in 42 U.S.C. § 12102(2) as follows:

The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

Parents contend that the family court erred as a matter of law when it concluded that the ADA does not provide a defense in a TPR proceeding. The gist of their argument is that since they are both individuals with a mental disability, DHS had an obligation under the ADA to: exert reasonable and active efforts to avoid foster placement of Daughter, formulate a service plan that reasonably accommodated their special needs, and provide them with every reasonable opportunity to obtain the necessary skills to provide Daughter with a safe family home.

Parents point out, for example, that despite the opinions of psychologists and social workers that Parents would never be capable of raising Daughter without the assistance of a responsible adult in their home, DHS provided no assistance to Parents in locating either an appropriate adult supervisor for their home or a supervised home that they could move to. Instead, DHS "put the burden of finding a responsible adult on the mentally disabled [P]arents and then complained about the people they found." Because DHS failed to comply with its obligations under the ADA, Parents argue, their parental rights were improperly terminated.

Based on the discussion that follows, we disagree.

A. *Mother and Father Are Not "Qualified Individuals with a Disability" for Purposes of the ADA*

■ There is no question in this case that Mother and Father are individuals with a disability. Dr. Loomis, a psychologist, testified that Mother was mildly mentally retarded (with an intelligence quotient (IQ) of between 55 and 69) and Father had "borderline intellectual functioning" (with an IQ of between 70 and 79).

There was substantial evidence in the record, however, to support the family court's determination that neither Mother nor Father was capable, even with the assistance of a reasonable service plan, of providing Daughter with a safe family home within a reasonable amount of time. Therefore, neither parent met the eligibility requirements for retaining his or her parental rights in Daughter and neither parent was a "qualified individual with a disability" for ADA Title II purposes.

611), which relates to telecommunications and common carriers.

In *Thompson v. Davis*, 295 F.3d 890 (9th Cir.2002), two state prisoners with substance abuse histories brought an action for injunctive relief against officials of the state parole authority, alleging that the authority followed an unwritten policy of automatically denying parole to prisoners with substance abuse histories, in violation of Title II of the ADA. The Ninth Circuit Court of Appeals held that the parole hearings were "programs and activities" within the meaning of the ADA. However, the court concluded:

> Title II does not categorically bar a state parole board from making an individualized assessment of the future dangerousness of an inmate by taking into account the inmate's disability. Title II only prohibits discrimination against "qualified" people with disabilities. 42 U.S.C. § 12131 (defining a qualified person with a disability as a person who "meets the essential eligibility requirements for the receipt of services"). A person's disability that leads one to a propensity to commit crime may certainly be relevant in assessing whether that individual is qualified for parole. In addition, the parole board might show that legitimate penological interests justify consideration of an inmate's disability status beyond that appropriate in other settings. The parole board claims to have and undeniably does have legitimate penological interests in considering the plaintiff's substance abuse backgrounds during the individualized inquiry for parole suitability. We hold only that plaintiffs may state a claim under Title II based on their allegations that the parole board failed to perform an individualized assessment of the threat they pose to the community by categorically excluding from consideration for parole all people with substance abuse histories.

*Thompson v. Davis*, 295 F.3d at 894 n. 4.

In *Alexander v. Margolis*, 921 F.Supp. 482 (W.D.Mich.1995), the plaintiff, a physician who suffered from bipolar disorder, brought a civil rights action alleging, among other grounds, that the Michigan State Board of Medicine (the Board) had violated the ADA by revoking and refusing to reinstate his license to practice medicine. Since the ADA had not taken effect until after the plaintiff's license had been revoked, only the complaint regarding the Board's failure to reinstate the plaintiff's license was addressed. In rejecting this claim, the United States District Court for the Western District of Michigan held:

> [I]t is questionable whether the Board's duty to license physicians can be characterized as a "service" being denied to plaintiff or whether the Board's refusal to reinstate his license denies him participation in "programs or activities provided" by a state entity. The Board of Medicine is, if anything, a service, program or activity provided for the public's benefit and safety, not for the benefit of any given individual who does not meet the state's requirements for practicing medicine.
>
> In any event, plaintiff is not a "qualified individual with a disability" under the ADA. The very nature of the police powers exercised by state boards of medicine require the state to discriminate on the basis of, among other considerations, a mental condition harmful to the public's safety. By the very nature of the practice of medicine, given the physician's necessary independence to "practice" his art, no reasonable modification can be made to a policy of restricting medical practice to those without evidence of mental disabilities. Under M.C.L. § 333.16247(1), the Board may reinstate a license only if the Board is satisfied by "clear and convincing evidence that the applicant is of good moral character, [and] is able to practice the profession with reasonable skill and safety . . . ." The Board cannot exercise its duty without the discretion to consider the impact of a mental disability upon one's ability to practice with reasonable skill and safety. The danger of irreparable harm to the public is too great to deny the Board such discretion. To require otherwise is unreasonable.

921 F.Supp. at 488.

Similarly, in *The Florida Bar v. Clement*, 662 So.2d 690 (1995), an attorney with bipolar mental disorder challenged his disbarment on grounds that the ADA prohibits discrimination against people with disabilities. After initially recognizing that a bipolar disorder is

a disability under the ADA, the Florida Supreme Court rejected the attorney's ADA claim, stating, in part:

> [T]he ADA would not necessarily bar this [c]ourt from imposing sanctions. "A person is a 'qualified' individual with a disability with respect to licensing if he or she, with or without reasonable modifications, 'meets the essential requirements' for receiving the license." This requires a case-by-case analysis of the disabled person and the jobs or benefits he or she seeks. [The attorney] is not "qualified" to be a member of the Bar because he committed serious misconduct, and no "reasonable modifications" are possible.

662 So.2d at 700 (citations omitted).

In this case, the record demonstrates that Mother and Father were not "qualified individuals with a disability" within the meaning of the ADA so as to preclude the termination of their parental rights in Daughter.

**B.** *The ADA Does Not Preclude the Termination of Parents' Parental Rights in Daughter*

**1.**

■ In arguing that "[t]he ADA does not apply to cases involving the termination of parental rights[,]" DHS referred to several cases that held that a TPR proceeding was not a "service, program or activity" subject to the ADA.[9]

In our view, while a TPR proceeding may not be a "service" as that term is ordinarily understood, it is clearly a "program or activity" of the family court, a public entity, within the meaning of the ADA. The Ninth Circuit Court of Appeals has made clear that the reach of Title II of the ADA should be as broad as possible. In the case of *Thompson v. Davis*, 295 F.3d 890 (9th Cir.2002) (discussed above), the court of appeals reversed the district court's denial of petitioners' ADA claim. The district court had ruled that pa-

role hearings could not be challenged using the ADA because the ADA did not apply to "the substantive decision making process in the criminal law context." *Id.* at 896–97. Disagreeing, the court of appeals stated:

> [W]e have interpreted Title II's "programs" and "activities" to include " 'all of the operations of' a qualifying local government." *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731 (9th Cir.1999). In reaching this conclusion, we noted that the legislative history of the ADA "strongly suggests that § 12132 should not be construed to allow the creation of spheres in which public entities may discriminate on the basis of an individual's disability." *Id.* Indeed, we found that Congress specifically rejected an approach that could have left room for exceptions to § 12132's prohibition on discrimination by public entities. *Id.* at 732. Given the breadth of the statute's language, parole proceedings, including substantive decision making, constitute an activity of a public entity that falls within the ADA's reach.

*Thompson v. Davis*, 295 F.3d at 899.

The logic of the *Thompson* analysis is equally applicable to a TPR proceeding, which, like a parole hearing, involves an adjudication to determine whether an individual's fundamental right must be curtailed for the good of society as a whole. Accordingly, we conclude that a TPR proceeding is a program or activity that is subject to the ADA.

**2.**

In this case, Parents have not alleged that they were discriminated against by a public entity during the TPR adjudicative process. They have not claimed, for example, that the family court had an unwritten policy of automatically terminating parental rights in all cases where both parents of a child are men-

---

9. We are aware that a number of courts across the country have determined that the ADA is not applicable to TPR proceedings because such proceedings are not "programs, services, or activities of a public entity" within the meaning of the ADA. *See, e.g., In re Anthony P.*, 84 Cal.App.4th 1112, 101 Cal.Rptr.2d 423 (2000); *People ex rel. T.B.*, 12 P.3d 1221, 1223 (Colo.Ct.App.2000); *In re Antony B.*, 54 Conn.App. 463, 735 A.2d 893 (1999); *State in Interest of B.K.F.*, 704 So.2d 314 (La.Ct.App.1997); *Adoption of Gregory*, 434 Mass. 117, 747 N.E.2d 120 (2001); *In re Terry*, 240 Mich.App. 14, 610 N.W.2d 563 (2000); *In re Custody of La'Asia S.*, 191 Misc.2d 28, 739 N.Y.S.2d 898 (N.Y.Fam.Ct.2002); *In re B.S.*, 166 Vt. 345, 693 A.2d 716 (1997).

tally disabled, regardless of their ability to provide a safe family home for the child. They also have not claimed that DHS had a policy of seeking to terminate the parental rights of all parents who were mentally disabled. The thrust of Parents' argument is that DHS's failure to provide services or programs to them to accommodate their special needs and allow them to raise Daughter in a safe family home constitutes an ADA violation that precludes the termination of their parental rights.

■ We agree with those courts that have held that the ADA does not allow parents to defend a TPR proceeding on the basis that they were not provided with appropriate services to accommodate their disabilities. As the Colorado Court of Appeals explained in *People ex rel. T.B.*, 12 P.3d at 1223–24:

> The proper focus of [a TPR] proceeding is the welfare of the child. Regardless of the special needs or restricted capabilities of the parent, the child is entitled to at least a minimum level of parental care. Although the Department of Human Services is a public entity and thus is subject to the ADA, nothing in the ADA suggests that a violation of the statute would interfere with the right of the state to terminate parental rights. To allow the provisions of the ADA to constitute a defense to terminate parental rights would improperly elevate the rights of the parent above those of the child.

*See also In re Anthony P.*, 84 Cal.App.4th 1112, 101 Cal.Rptr.2d 423 (2000) (holding that the ADA is inapplicable when used as a defense by the parents in dependency proceedings); *Adoption of Gregory*, 434 Mass. at 121, 747 N.E.2d at 125 (concluding that "the parents' rights are secondary to the child's best interests and thus, the proper focus of termination proceedings is the welfare of the child .... 'nothing in the ADA suggests that a violation of the statute would interfere with the right of the state to terminate parental rights.' ").

In other words, violations of the ADA are not remedied by the denial of a petition for TPR, if the best interests of a child require that a parent's parental rights in the child be terminated.

### C. DHS Provided Reasonable Services to Accommodate Parents' Deficiencies

■ Despite the claim of Parents that DHS violated the ADA by not providing them with a level of services that would have allowed them to provide Daughter with a safe family home, the record demonstrates that DHS went out of its way to provide intensive, individualized services to Mother and Father to help them become better parents so they could be reunified with Daughter.

Lum, who had been involved with the mentally disabled population for thirty years, testified that she went "out of [her] way in trying to accommodate them as much as possible, because ... [her] heart really goes out to them" and she was aware that with this population, "sometimes they need more time, sometimes they need more help, but sometimes they can learn." Lum testified that because she has a twenty-eight-year-old son with Down Syndrome, she knew "the possibilities in the community about either group home living or living independently with a supervisor in the building, monitoring." She attempted to get Parents into an Association for Retarded Citizens group home or other suitable housing. However, Parents did not qualify for such homes because none of them accepted couples and Father and Mother refused to be separated. Lum also was aware that a previous social worker "had found a house in Pearl City that may have had an opening, but there was a long wait list, and [Mother] didn't qualify." Additionally, an apartment in Waipahu had been located for Parents, but either Mother did not want to move to Waipahu or the apartment manager heard about the filthy conditions in Parents' Maileland home and changed her mind about renting the apartment to Parents. There was also testimony that when Parents had lived in transitional housing, where services were provided to the residents, their living quarters were just as unsafe and unsanitary as they were when Daughter had been taken from them.

Lum also testified extensively about her efforts to find people who would be willing to

32

supervise Parents if they lived independently. However, all the leads she pursued did not, due to past histories, qualify to monitor Parents.

The record thus reveals substantial evidence that DHS met its obligation under the ADA to provide services that reasonably accommodated Parents' special needs as mentally deficient parents. *See In Interest of C.M.*, 526 N.W.2d 562 (Iowa Ct.App.1994); *In re Angel B.*, 659 A.2d 277 (Me.1995); *In re A.J.R.*, 78 Wash.App. 222, 896 P.2d 1298 (1995).

D. *The Remedy Parents Seek Is Not Required by the ADA*

■ Even if we were to assume that an ADA violation occurred in this case, Parents would not be entitled to the remedy they seek. Under the ADA, a public entity is obligated to make only "reasonable" modifications that "do not fundamentally alter the nature of the service, program, or activity." *Crowder v. Kitagawa,* 81 F.3d 1480, 1485 (9th Cir.1996) (citing 28 C.F.R. § 35.130(b)(7).) Parents claim that DHS was obligated to provide them with full-time parenting supervision so they could provide a "safe family home" for Daughter. Such a requirement, however, would change the nature of the services provided by DHS and would not be reasonable.

## CONCLUSION

For the reasons discussed above, we affirm: (1) the Order Awarding Permanent Custody, entered by the family court on January 22, 2001; and (2) the Orders Concerning Child Protective Act, entered by the family court on May 24, 2001.