60 P.3d 285

**In the Interest of Jane DOE, Born on December 29, 1999, Minor.**

No. 24079.

Supreme Court of Hawai'i.

Dec. 26, 2002.

---

Joseph Dubiel, for Mother–Appellant.

Wilfred S. Tangonan, for Father–Appellant.

Susan Barr Brandon, Jay K. Goss, and Mary Ann Magnier, Deputy Attorneys General, for Department of Human Services–Appellee.

LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.; with MOON, C.J., Concurring Separately and Dissenting.

Opinion of the Court by ACOBA, J.

We hold that a parent's allegations of a violation of the Americans with Disability Act (ADA), 42 U.S.C. §§ 12131 through 12134, do not raise a defense in a proceeding to terminate parental rights under Hawai'i Revised Statute (HRS) § 587–73 (1993). However, Department of Human Services–Appellee (DHS) should provide "[e]very reasonable opportunity" to a parent to succeed in reuniting a family, HRS § 587–1 (1993 & Supp. 2001), particularly in establishing the steps necessary to reunite the family in the form of a service plan.[1] *See* HRS 587–26 (1993; Supp.2001). In addition, we hold that a criminal charge, conviction, or incarceration does not per se result in the forfeiture of parental rights, but confinement can be considered a factor in deciding whether a parent may provide a safe family home in the foreseeable future. In the instant case, allegations of ADA violations raised by Mother–Appellant (Mother)[2] do not constitute a defense to the termination of parental rights in her daughter, Jane Doe (Jane). Further, Mother failed to demonstrate that she was substantially prejudiced by DHS's alleged failure to assist her in complying with the court's service plan for reunification with Jane. As to Father–Appellant (Father), despite his contention that the Family Court of the First Circuit[3] (the court) erred in concluding that he was incapable of providing a safe home for Jane, presently or in the reasonable future, the court's findings that he was incapable of doing so were not clearly erroneous. There-

---

1. HRS § 587–1 states, in pertinent part:

   Every reasonable opportunity should be provided to help the child's legal custodian to succeed in remedying the problems which put the child at substantial risk of being harmed in the family home.... Where the court has determined, by clear and convincing evidence, that the child cannot be returned to a safe family home, the child will be permanently placed in a timely manner.

2. For purposes of preserving confidentiality, the subject child is referred to as Jane Doe, Father–Appellant is referred to as "Father," and Mother–Appellant is referred to as "Mother."

   Mother and Father were not married at the time of the proceedings below. However, Father has never denied that he is the natural father of Jane.

3. The Honorable Marilyn Carlsmith presided over the case.

fore, we affirm the court's January 11, 2001 order, which granted custody of Jane to DHS, and the January 19, 2001 order denying reconsideration of that order.

## I.

Both parents appeal separately from the January 11, 2001 final order awarding permanent custody of Jane to the DHS, as provided by HRS chapter 587, the Hawai'i Child Protective Act (CPA), and the January 19, 2001 order denying reconsideration by the court. Mother contends that the court erred in concluding that: 1) Mother is not willing and able to provide Jane with a safe home within a reasonable period of time; 2) DHS made reasonable and active efforts to reunify Jane with Mother; and 3) the ADA is not a defense to the CPA. Father argues that the court erred: 1) in concluding that Father was not willing to engage in court-ordered services and to provide a safe home for Jane; 2) in ruling that DHS exerted reasonable and active efforts to reunite the family; 3) in failing to order placement of Jane with a "calabash" cousin; and 4) in committing several procedural errors.

## II.

Jane was born two months prematurely in Honolulu, Hawai'i on December 29, 1999. She suffers from a breathing problem and came to DHS's attention after she was hospitalized on May 19, 2000 for cyanotic episodes (bluish discoloration around the lip). According to Jane's guardian ad litem, Jane appeared very frightened and suspicious of people.

Mother suffers from a mental health disorder with reoccurring episodes of self-mutilation. Past incidents have included scratching her forearms, stabbing herself in the abdomen and neck, and hitting her head.

Father has been incarcerated since October 2000, and his parole was revoked on November 15, 2000. He is currently serving a felony term which has a maximum expiration date of February 7, 2005. The court

noted that he was on trial for a second charge of assault involving an incident between Mother and Father, although the current status of that charge is not clear.

On May 22, 2000, according to the Kapiolani Hospital staff, Father dropped Jane to the floor and she was found "spinning" in wires that connected her to a machine. When the staff confronted Father, he allegedly became angry and left. Father contends that he was attempting to burp Jane and was unable to do so because the wires were tangled.

On the same day, upon leaving the hospital, Mother threatened to kill herself with a knife. Police were called and Mother was taken to a hospital. Upon admission to Queen's Medical Center, Mother tested positive for the use of crystal methamphetamine.

At this time, Mother admitted to DHS that she had been previously hospitalized for mental health treatment after similar suicide attempts. Following a prior hospitalization of Jane in January 2000, however, Mother refused mental health and public health nursing services offered by Kapiolani Hospital.

During this interview, DHS learned that Jane had been discharged from the hospital with an APNEA monitor [4] in January 2000, but the parents had returned the monitor. The parents claimed that the monitor was defective because it gave off numerous false positive readings and they received permission from their doctor to discontinue use of the device. Subsequent to Jane's discharge on May 31, 2000, she was placed on an APNEA monitor and was kept on it until August 2000.

On May 24, 2000, the Honolulu Police Department assumed protective custody of Jane. Jane was immediately placed in temporary foster custody by DHS pursuant to HRS § 587–22(c) (1993 & Supp.2000). A petition was filed on May 30, 2000, alleging that the parents lacked the appropriate parenting skills to provide a safe home and that Mother's mental health problems and possible substance abuse threatened harm to Jane. Mother and Father were both served

---

4. The APNEA monitor, while not described by any of the parties, appears to be an alarm that goes off when a person fails to breathe properly.

"Apnea" is defined as "cessation of breathing." Richard Sloane, *The Sloane–Dorland Ann. Medical–Legal Dictionary* 45 (1987).

with a copy of the summons, petition, and a certified copy of the initial Safe Family Home Report and Interim Family Service (service plan).[5] The service plan required the parents to participate in substance abuse assessment/treatment and random drug testing; the plan also mandated cooperation with DHS social workers.[6]

On June 1, 2000, a hearing was held regarding the petition. An attorney, retained by Father, appeared on the parents' behalf and requested a continuance so that the parents could be present at the hearing. The court continued the hearing date to June 8, 2000, and awarded temporary foster custody of Jane to DHS.

At the June 8, 2000 hearing, Mother and Father again failed to appear.[7] Without objection, the court took jurisdiction over the matter, awarded foster custody of Jane to DHS, and ordered the service plan be implemented and psychological evaluations of both parents.[8] The court also entered defaults against the parents and issued bench warrants for both of them. All parties were ordered to appear at a review hearing on August 21, 2000.

**5.** "A service plan is a specific written plan ... [containing] the steps that will be necessary to facilitate the return of the child to a safe family home...." HRS § 587–26 (1993).

**6.** Cooperation was broadly defined, including "keeping appointments, attending other services as recommended[,] and informing DHS of changes at home or problems in following the service plan."

**7.** Both parents contend that they were told the wrong date by their attorney.

**8.** Specifically, the court made the following findings:
A. Continuation in the family home would be contrary to the immediate welfare of the child(ren);
B. Under the circumstances that are presented by this case, reasonable efforts were made by the DHS prior to the placement of the child(ren) out of the family home to prevent or eliminate the need for removal of the child(ren) from the family home;
C. Under the circumstances that are presented in this case, reasonable efforts are being made by the DHS to make it possible for the child(ren) to return to the family home;

On June 15, 2000, warrants were issued, and Mother and Father were arrested the next day. They appeared before the court on June 19, 2000. Both expressed a willingness to cooperate with the DHS social worker. They agreed to undergo psychological evaluations and to comply with the service plan. Mother and Father were ordered to meet with the social worker as soon as possible and to attend a review hearing on August 21, 2000. Applications for court-appointed counsel were submitted, and new counsel were appointed for each parent by the court on June 26, 2000.

On August 21, 2000, the parents again failed to appear in court and defaults were entered. A service plan prepared by DHS on August 7, 2000 was ordered. Based on the parents' failure to attend the hearing, the presiding judge ordered DHS to file a motion for permanent custody of Jane. DHS timely moved for permanent custody of Jane to be transferred to it pursuant to HRS § 587–73 (1993 & Supp.2001). At the next hearing on September 21, 2000, Father again failed to attend and the matter was scheduled for trial on October 6, 2000.

D. Based upon the report(s) submitted pursuant to HRS § 587–40 and the record herein, there is an adequate basis to sustain the petition in that the child(ren) is/are a child(ren) whose physical or psychological health or welfare has been harmed or is subject to threatened harm by the acts or omissions of the child(ren)'s family;
E. Each party present at the hearing understands that unless the family is willing and able to provide the child(ren) with a safe family home, even with the assistance of a service plan, within a reasonable period of time stated in the service plan, their parental and custodial duties and rights shall be subject to termination;
F. Each term, condition and consequence of the service plan dated 5/30/00 and attached as Exhibit "A" has been explained to and is understood by each party present at the hearing;
G. Each party at the hearing knows that they have no right to take or entice the child(ren) from the lawful custody of the [DHS] or to remove the child(ren) from the State of Hawai'i[.]
We note that findings F and G are somewhat misleading because neither parent was present at the June 8, 2000 hearing.

On October 6, 2000 and October 9, 2000, a permanent custody trial was held. All parties were present. After hearing all of the evidence, the court found by clear and convincing evidence, pursuant to HRS § 587–73, that neither Mother nor Father were presently willing and able to provide a safe family home for Jane, even with a service plan, and that it was not reasonably foreseeable that Mother would become willing and able to provide a safe family home for Jane. The court specifically rejected Mother's claims that, pursuant to the ADA, she suffered from a disability and, thus, more time and services should have been offered to her before her parental rights were terminated.

On the other hand, the court continued the motion for three months as to Father, because it believed that Father could potentially provide a safe family home if he was acquitted on assault charges relating to Mother and his parole was not revoked. The court ordered Father to contact DHS and Jane's guardian ad litem within forty-eight hours of his release from incarceration, provide certificates of completion of services to DHS without delay, and complete a psychological evaluation with a provider approved by DHS.

On January 11, 2001, during a permanent custody hearing, DHS offered evidence that Father's parole had been revoked and that Father would not appear before the paroling authority for parole consideration until November 2001. Father testified on his own behalf about his efforts to comply with the service plan while incarcerated. He also argued that he could provide for Jane by having her placed with his "calabash" cousin.

The court granted DHS's motion for permanent custody, concluding by clear and convincing evidence that it was not reasonably foreseeable that Father would become willing and able to provide a safe family home for Jane within a reasonable period of time. The court specifically noted Father's failure to participate in any service offered to him by DHS, before and after he was incarcerated. In addition, the court observed that Father had anger problems and an inability to provide for Jane. Because of the evidence already considered, the court ruled that a permanent plan of custody to DHS for eventual adoption was in the child's best interest. Timely motions for reconsideration, pursuant to HRS § 571–54 (1993), were filed but were denied by the court.

## III.

On appeal, Mother argues that DHS "is a public entity authorized by the state and is therefore subject to the provisions of the [ADA.]" Inasmuch as the court found that she suffers from a "severe mental health disorder[,]" she claims that DHS is required to make "reasonable accommodations" on account of her mental disability to enable her to participate in DHS services and programs. Mother asserts that DHS did not make such accommodations. Accordingly, she requests that the court's orders be reversed and a new trial be commenced, with more time and accommodations provided for Mother to comply with the service plan.

Many of the cases examining the issue of parental rights and the ADA hold that a termination proceeding is not a "service, program, or activity" within the definition of the ADA and, consequently, the ADA does not apply to such proceedings. *See In re Anthony P.*, 84 Cal.App.4th 1112, 101 Cal.Rptr.2d 423, 425 (2000) ("a proceeding to terminate parental rights is not a governmental service, program, or activity"); *In re Antony B.*, 54 Conn.App. 463, 735 A.2d 893, 899 (1999) (the ADA "neither provides a defense to nor creates special obligations in a parental rights termination proceeding"); *M.C. v. Dept. of Children and Families*, 750 So.2d 705, 706 (Fla.Dist.Ct.App.2000) ("[D]ependency proceedings are held for the benefit of the child, not the parent."); *In re Terry*, 240 Mich.App. 14, 610 N.W.2d 563, 569 (2000) ("Termination of parental rights proceedings are not 'services, programs or activities' ... [and] therefore a parent may not raise violations of the ADA as a defense to termination of parental rights proceedings."); *In re Adoption of Gregory*, 434 Mass. 117, 747 N.E.2d 120, 125 (2001) ("Proceedings to terminate parental rights are not 'services, programs, or activities,' under provision of [the ADA] ... and therefore, the ADA is not a defense to such proceedings.").

There is a smaller number of courts that avoid the ADA question by "finding on the facts presented that the State agency, through the provision of services designed to meet the parent's special needs, had met any obligations that might be imposed by the ADA." *Gregory*, 747 N.E.2d at 125 (citing *In re Angel B.*, 659 A.2d 277 (Me.1995) and *In re C.M.*, 526 N.W.2d 562 (Iowa Ct.App. 1994)); *see also In re A.J.R.*, 78 Wash.App. 222, 896 P.2d 1298, 1302 (1995).

A few courts hold that the ADA *may* be a defense to parental rights termination cases. *See In re C.M.*, 996 S.W.2d 269, 270 (Tex.Ct. App.1999) (suggesting that the ADA may be defense to a termination proceeding, but rejecting the defense on procedural grounds); *Stone v. Daviess County Div. of Children & Family Servs.*, 656 N.E.2d 824, 830 (Ind.Ct. App.1995) (if there were a statutory requirement to exert reasonable efforts to reunite parent and child, then that statute would be preempted by the ADA, but because there was none, the ADA did not apply).

## IV.

### A.

We hold that allegations of an ADA violation are not a defense to a termination proceeding because any purported violation may be remedied only in a separate proceeding brought under the provisions of the ADA.[9]

*In re B.S.*, 166 Vt. 345, 693 A.2d 716 (1997), is illustrative. In that case, the mother was a moderately retarded woman who appealed termination of her parental rights. She claimed that the social services defendant had not accommodated her disability under the ADA, failing to provide "services needed to parent her child." *Id.* at 720. In rejecting the mother's claim, the Vermont Supreme Court concluded in part that the remedy for an alleged violation under the ADA is by way of a separate private right of action and/or grievance procedure as set forth in the ADA itself:

> We further note that nothing in the ADA suggests that denial of [a termination proceeding] is an appropriate remedy for an ADA violation. Under analogous circumstances, other courts have refused to graft ADA requirements onto unrelated statutes. This is not to say that the mother is without a remedy if [the state agency] has violated the ADA. The ADA provides for a private right of action for Title II violations, 42 U.S.C. § 12133, and its regulations require public entities to adopt and publicize grievance procedures, 28 C.F.R. § 35.107, and outline a federal complaint procedure, *id.* § 35.170. Pursuant to these provisions, the mother could have filed a complaint or brought a civil action to obtain relief.

*Id.* at 721 (citations omitted). Thus the court held "the mother may not raise violations of the ADA as a defense to [a parental rights termination] proceeding." *Id.* at 722.

In *In re B.S.*, the Vermont Supreme Court relied on *In re Torrance P.*, 187 Wis.2d 10, 522 N.W.2d 243 (Wis.Ct.App.1994). In *Torrance*, the parent, Raymond C., was "developmentally disabled and unable to read." *Id.* at 244. He maintained that the department of human services "violated the ADA by failing to reasonably accommodate his developmental disability, and that this failure to accommodate was a substantial factor resulting in the [termination] order." *Id.* The

---

9. We note that state courts have concurrent jurisdiction over ADA claims. *See Jones v. Illinois Cent. R. Co.*, 859 F.Supp. 1144, 1145 (N.D.Ill. 1994). In *Jones*, the court noted that the remedies section of the ADA specifically incorporated provisions of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e–17. *See id.*; 42 U.S.C. § 12117(a) ("The powers, remedies, and procedures set forth in sections 2000e–4, 2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers, remedies, and procedures [of the ADA.]"). In that respect the United States Supreme Court has unanimously held that state courts have concurrent jurisdiction with federal courts in adjudicating Title VII claims brought by employees. *See Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990). Accordingly, it necessarily follows that state courts have jurisdiction with federal courts over matters involving the ADA. *See Jones*, 859 F.Supp. at 1145; *see also Black v. Department of Mental Health*, 83 Cal.App.4th 739, 100 Cal.Rptr.2d 39, 42 n. 4 (2001) (citing *Jones*); *Weaver v. New Mexico Human Servs. Dept.*, 123 N.M. 705, 945 P.2d 70, 71 (1997) (citing to a number of cases for the proposition that state courts have the authority to hear ADA claims).

Wisconsin Court of Appeals held that under Wisconsin statutes the county must show by "clear and convincing evidence that the agency responsible for the care of the child and the family has made a diligent effort to provide the services ordered by the court[,]" *id.* at 245 (internal quotation marks and citation omitted), and concluded that "the trial court's finding that the County made a diligent effort to provide services ordered by the court is not clearly erroneous." *Id.*

However, in denying Raymond's request to overturn the termination order, the Wisconsin Court of Appeals held that his claim may be the subject of "a separate cause of action under the ADA," unrelated to the termination proceeding:

> Congress enacted the ADA to eliminate discrimination against people with disabilities and to create causes of action for qualified people who have faced discrimination against people with disabilities and to create cause of action for qualified people who have faced discrimination. *See* 42 U.S.C. § 12101(b). Congress did not intend to change the obligations imposed by unrelated statutes. Raymond may have a separate cause of action under the ADA based on the County's actions or inactions; such a claim, however, is not a basis to attack the [termination] order.

*Id.* at 246.

There is nothing in the ADA that indicates that an appropriate remedy for an ADA violation is the reversal of a parental termination order. *See In re La'Asia S.,* 191 Misc.2d 28, 739 N.Y.S.2d 898, 909 (2002) (" 'nothing in the ADA suggests that denial of [a termination order] is an appropriate

remedy for an ADA violation' ") (quoting *In re BKF,* 704 So.2d 314, 317 (La.App.1997)); *In re B.S.,* 693 A.2d at 721; *Torrance,* 522 N.W.2d at 245. Instead, the ADA provides for a private right of action,[10] and mandates that public entities adopt and publicize grievance procedures. *See* 42 U.S.C. § 12133; 28 C.F.R. § 35.107. Nor is there anything in the ADA or its legislative history suggesting that it was intended to be grafted onto state statutes for the purpose of supplementing remedies already provided for in such statutes. *See In re B.S.,* 693 A.2d at 721. Accordingly, we hold that mere allegations of an ADA violation do not constitute a defense in a termination proceeding.

### B.

In *In re Jane Doe, Born on February 2, 1999,* 100 Hawai'i 20, 58 P.3d 78 (App.2002), the Intermediate Court of Appeals (ICA) held that a termination of parental rights proceeding (termination proceeding) is a "program" or "activity" covered under the ADA. Applying the ADA, the ICA addressed the merits of the parents' claim.[11] As we hold here, such claims cannot be raised in a termination proceeding as a defense. Thus, the merits of such claims are not properly decided in a termination proceeding in the family court and are not appropriate for decision on appeal from that court. The merits are outside the purview of the family court in a termination proceeding, and thus *In re Jane Doe,* except for its affirmance of the family court's orders, must be overruled.

The concurrence/dissent disagrees with our decision to overrule *In re Jane Doe,* stating that "[t]he majority opinion fails to

---

10. Currently there is controversy concerning whether an ADA action against a state is a violation of the eleventh amendment of the United States Constitution. *See Lovell v. Chandler,* 303 F.3d 1039, 1050–51 (9th Cir.2002) (holding that the eleventh amendment does not bar claims against a state brought under title II of the ADA); *Doe v. Division of Youth & Family Servs.,* 148 F.Supp.2d 462, 485, 489 (D.N.J.2001) (holding that Congress "exceeded its constitutional authority under § 5 of the Fourteenth Amendment when it purported to abrogate State sovereign immunity") and cases cited therein. We are not presented with this issue.

11. In *In re Jane Doe,* the parents of a child both suffered from mental and cognitive deficiencies. *See* 100 Hawai'i at 22–24, 58 P.3d at 80–82. Custody of the child was permanently removed because of the parents' inability to provide a safe family home. *See id.* at 27–28, 58 P.3d at 85–86. The ICA held that the ADA applies to a termination proceeding. *See id.* at 29–31, 58 P.3d at 87–89. Addressing the merits of the case, the ICA held that the parents were not "qualified individuals with a disability" under the terms of the ADA. *Id.* at 28–31, 58 P.3d at 86–89. Finally, the ICA held that DHS had made reasonable efforts to accommodate the parent's deficiencies. *See id.* at 30–31, 58 P.3d at 88–89.

make the distinction between 'services, programs, or activities' offered by DHS, specifically pursuant to an individualized family service plan, and the [termination] proceeding itself." Concurring and dissenting opinion at 347, 60 P.3d at 297. Respectfully, the concurrence/dissent fails to note that we do not hold that the termination proceeding is not a "service, program, or activity[.]" As the Vermont Supreme Court noted, "we do not mean to suggest that parents lack any remedy for ... alleged violations of the ADA[,]" *In re B.S.*, 693 A.2d at 722, such as where "the family court had an unwritten policy of automatically terminating parental rights in all cases" where a parent was disabled. *In re Jane Doe*, 100 Hawai'i at 30, 58 P.3d at 88.

We are not presented with a separate case where a parent has raised an affirmative claim under the ADA against the DHS. Instead, Mother has presented an alleged violation as a defense to a proceeding involving her parental rights. The concurrence/dissent fails to indicate any section of the ADA or case law that supports the proposition that "an ADA defense may be properly raised in a [termination] proceeding[,]" concurring and dissenting opinion at 347, 60 P.3d at 297. Quite simply, the statute does not state that an appropriate remedy for an ADA violation is to allow an injured party to utilize the ADA as a defense in a separate proceeding.[12] *See Stone v. Daviess County*, 656 N.E.2d at 830 ("any alleged noncompliance with the ADA ... [is] a matter separate and distinct from the operation of [a termi-

nation proceeding]"); *In re Torrance P.*, 522 N.W.2d at 244 (an "alleged violation of the ADA is not a basis to attack [termination] proceedings").[13]

V.

We note, however, that DHS is under an obligation to provide a reasonable opportunity to parents through a service plan to reunify the family. *See* HRS §§ 587–1 and 587–26. The "purpose; construction" section of chapter 587, HRS § 587–1, establishes the legislative intent to provide "[e]very reasonable opportunity" for a parent to be reunited with his or her child. Moreover, HRS § 587–26, which mandates that DHS create a service plan outlining "[t]he steps that will be necessary to facilitate the return of the child to a safe family home," further indicates that DHS has an obligation to make reasonable efforts to reunite parent and child.

Here, DHS was aware that Mother suffered from a severe mental problem at the time the service plan was ordered. Despite this, the only aid DHS seemingly offered to Mother was to provide her with phone numbers of the counselors whom she was expected to contact. DHS apparently did not follow up with respect to this requirement. Merely proffering a list of phone numbers may fall short of the policy that DHS make every reasonable opportunity to reunite the family. However, under the circumstances, we cannot conclude that substantial prejudice resulted to Mother. *See* Hawai'i Family Court Rules Rule 61 (2000).[14]

---

12. We should not imply a particular remedy in a statute where one does not otherwise exist. As stated by this court in *Iddings v. Mee–Lee*, 82 Hawai'i 1, 919 P.2d 263 (1996),

> [w]hen construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself. *Pacific Int'l Servs. Corp v. Hurip*, 76 Hawai'i 209, 216, 873 P.2d 88, 95 (1994). Where the language of a statute is plain and unambiguous, our only duty is to give effect to the statute's plain and obvious meaning. *Bumanglag v. Oahu Sugar Co., Ltd.*, 78 Hawai'i 275, 280, 892 P.2d 468, 473 (1995).

*Id.* at 6–7, 919 P.2d at 268–69.

13. The ADA does provide a judge with equitable powers, *see* 42 U.S.C. § 12117(a); 42 U.S.C.

§§ 2000e to 2000e–17, but we are not faced with any resort to that type of proceeding.

14. Hawai'i Family Court Rules Rule 61 states that

> [n]o error in either the admission or the exclusion of evidence and *no error or defect in any ruling or order or in anything done or omitted by the court* or by any of the parties *is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice.* The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties. (Emphases added.)

As DHS contends, and Mother does not contest, Mother specifically stated that she did not participate in DHS-offered services because she did not believe she needed parenting education or drug testing. Nor did she participate in services offered to her earlier while she was at Kapiolani Hospital. It is apparent that Mother was unwilling to participate in DHS services. In addition, it seems that, as DHS argues, Mother never contested the service plan or requested additional services or accommodations from DHS until the start of trial. Manifestly, a claim for additional services and accommodations must be timely made. While it could be argued that Mother was hampered in asking for assistance because of her mental condition, we note that Mother was represented by counsel, who could have notified DHS on Mother's behalf. No request, however, was ever made until trial. Under such circumstances, we cannot hold that Mother has any cognizable procedural complaint.[15]

## VI.

■ In the present case, the court was presented with clear and convincing evidence that Mother was presently incapable of providing a safe home for Jane and was unlikely to be able to provide one in the future. *See In re Jane Doe, Born on June 20, 1995*, 95 Hawai'i 183, 192, 20 P.3d 616, 625 (2001). Conclusions regarding a parent's ability to provide a safe family home present "mixed questions of fact and law [which are] reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case." *In re Jane Doe*, 95 Hawai'i at 190, 20 P.3d at 623. Findings were made about Mother's substance abuse and involvement in domestic violence, which are supported by evidence on the record. In addition, the court found that Mother suffered from a severe mental health disorder,

triggered under stress, which caused Mother to mutilate herself.

Witnesses also testified about Mother's lack of parenting skills and insight into Jane's needs. This was demonstrated by Mother's insistence upon putting Jane to sleep on her stomach, even though she was told it was dangerous, because Mother testified "she knew what was best for her child." In addition, Mother testified that she stopped visiting her child because the visits were scheduled too early in the morning. This testimony supported the court's finding that Mother lacked insight into Jane's needs. Accordingly, we cannot conclude, under these facts, that the court erred in terminating Mother's rights.

## VII.

■ Looking to Father's challenges to several findings of fact, we discern no error in the court's findings that require reversal. A finding of fact is clearly erroneous when "(1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citation omitted). Here, the record contains substantial evidence, or "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion" consistent with the court's findings. *In re Doe*, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996).

### A.

Each of the contested findings regarding domestic violence between Mother and Fa-

---

**15.** Mother states she was given only three months to comply with the service plan. DHS maintains Mother had four months. As the ICA has noted, there is "nothing in HRS chapter 587 or in its legislative history which indicates that DHS must engage in attempts at reunification for a [particular] period ... before its efforts may be deemed 'reasonable.'" *In re Doe*, 89 Hawai'i 477, 491, 974 P.2d 1067, 1081 (App.1999).

Based on Mother's continued failure to appear before the court at any of the previously scheduled hearings and her express unwillingness to participate in any service programs, three months may have been a reasonable period of time under these facts. Our review is limited to whether the court's determination was clearly erroneous. *See* discussion *infra*.

ther is supported by substantial evidence.[16] Similarly, the findings regarding Father's anger problems [17] and lack of insight into Jane's needs were not clearly erroneous.[18]

### B.

We examine in more detail Father's challenge to the finding that he failed to appear at a psychological evaluation or initiate any of the service plan requirements. Father indicates that, while on parole, he did not participate in his service plan because he was afraid the police would kill him if he appeared for services. Once he was in custody, Father was unable to comply with the service plan because the services offered within the prison system did not satisfy DHS requirements.

■ We note, first, that involuntary confinement, a criminal charge, or conviction for a criminal offense does not mandate a per se forfeiture of a parent's rights to a child. *See In re J.M.S.*, 83 S.W.3d 76, 83 (Mo.Ct.App. 2002) (citing to a governing statute and holding that incarceration by itself is not grounds for termination of parental rights); *In re Brian D.*, 209 W.Va. 537, 550 S.E.2d 73, 76 (2001) ("[I]ncarceration, *per se*, does not warrant the termination of an incarcerated parent's parental rights.") (Italics in original.); *In re F.N.M.*, 951 S.W.2d 702, 706 (Mo.Ct. App.1997) (holding that incarceration, in and of itself, may not be grounds for termination of parental rights); *In re Staat*, 287 Minn. 501, 178 N.W.2d 709, 713 (1970) ("[S]eparation of child and parent due to misfortune and misconduct alone, such as incarceration of parent" is not per se grounds for termination); *Diernfeld v. People*, 137 Colo. 238, 323 P.2d 628, 630 (1958) ("We cannot hold that every convicted felon, by that fact alone, loses all parental rights in children."). For instance, an imprisoned parent may have other family members who would be able to care for the child during the confined parent's absence.

■ However, incarceration may be considered along with "other factors and circumstances impacting the ability of the parent to remedy the conditions of abuse and neglect." *In re Brian D.*, 550 S.E.2d at 77. Thus, if the sole caretaker of a child is confined for a long period of time, the lack of permanence or guidance in the child's life may be a factor in considering whether the parent may be able to provide a safe family home within a reasonable period of time.

■ While there is no dispute that DHS had an obligation to make every reasonable opportunity to reunite Father and Jane, it is not reasonable to expect it to provide services beyond what was available within the corrections system. Obviously, an incarcerated parent is incapable, by himself or herself, of maintaining a safe family home until he or she has been released from prison. Therefore, the completion of a service plan is an empty pursuit until the parent has been released and is capable of raising a child again. At that point, the parent would be able to participate in a service plan with DHS's assistance.

---

**16.** It is uncontested that on May 22, 2000, a domestic incident occurred in the hospital parking lot between Mother and Father. In addition, the initial assessment of Mother and Father, prepared by DHS on May 30, 2000, contained an interview with Jane's maternal grandmother, who recounted that Father is very controlling of Mother, not allowing her to use the phone, go out, or answer the door. In a supplemental report dated on August 7, 2000, an interview with the maternal grandmother revealed that Mother was hospitalized due to injuries caused by Father. When Mother was asked about this incident, she allegedly became upset and terminated the phone interview. Mother later denied the allegation that Father committed the abuse and stated that she caused them herself. It is uncontested that Father was arrested for second degree assault regarding this incident.

**17.** It is undisputed that DHS reported that the maternal aunt and maternal grandmother were threatened by Father for assisting DHS in investigating this case. As a result, Father was ordered to have no further contact with them. On December 20, 2000, Father had an angry outburst in court, yelling, "You f* * *s—I hate you guys," and had to be removed. The court later noted this as an example of an on-going anger problem for which Father was being treated.

**18.** On October 9, 2000, Father gave lengthy testimony regarding his daughter. From this testimony, it appears that there was substantial evidence to find that Father lacked insight into Jane's needs. For instance, Father testified that Jane did not have a breathing problem.

In the present case, DHS established that it was willing to assist Father once his incarceration ended. In addition, the court delayed the award of permanent custody, specifically so Father would have an opportunity to meet the terms of the service plan. However, it was subsequently determined that Father would not be released within the foreseeable future. Accordingly, we conclude DHS made reasonable efforts, under the circumstances, to reunify Father and Jane.

## VIII.

We perceive no error in Father's remaining contentions.

He asserts that the court erred in not allowing placement of Jane in the care of a "calabash" cousin rather than terminating his parental rights. However, upon the termination of parental rights, discretion to determine an appropriate custodian is vested in DHS.[19]

Father argues further that the admission of the testimony from a deputy sheriff about a car chase and Father's subsequent arrest the night before the hearing was in error. However, there was no apparent abuse of discretion in the court's decision to allow the sheriff to testify, although he was not on DHS's witness list,[20] or with respect to Hawai'i Rules of Evidence (HRE) Rule 403.[21]

Father also urges that the court committed reversible error during the October 6, 2000 hearing when it prevented him from continuing to cross-examine the maternal grandmother regarding her fear that Father would physically abuse Jane.[22] Assuming error, however, it was without substantial prejudice to Father and thus harmless.[23]

19. Without relying solely on the fact of Father's current incarceration, the court found that Father was incapable of providing a safe family home. After termination of rights, custody is given to DHS which is charged with finding a suitable home for the child. See HRS § 587–73(b)(2) ("permanent custody [is] awarded to an appropriate authorized agency").

20. Father objects to the sheriff's testimony because he was not on DHS's witness list and Father's counsel did not have time to prepare reasonable cross-examination. In opposition, DHS argues that it could not have anticipated the events of the night before.

The admission of evidence is a matter within the sound discretion of the trial court, which will not be disturbed in the absence of an abuse of discretion. See Walsh v. Chan, 80 Hawai'i 212, 215, 908 P.2d 1198, 1201 (1995). Because the events occurred the day before, it was within the court's discretion to admit the sheriff's testimony. Moreover, it does not appear that the court relied upon the sheriff's testimony in its findings or conclusions. Thus, the sheriff's testimony does not appear to have substantially prejudiced Father.

21. Father argues that the deputy sheriff's testimony were unfairly prejudicial under HRE Rule 403 and should not have been admitted. The sheriff testified that, during a car chase, Father drove straight at him and the sheriff nearly used deadly force to stop Father. We note that Father did not object to this testimony at trial. In the absence of such an objection at trial there cannot be error, absent plain error. See Tabieros v. Clark Equip. Co., 85 Hawai'i 336, 379 n. 29, 944

P.2d 1279, 1322 n. 29 (1997). Here, there is no allegation or evidence of plain error and we accordingly decline to examine this issue.

22. The court did not allow Father to cross-examine on this point, stating, "No. We've got to move on at this point. Otherwise, you're not going to have any chance to have your witnesses on." Father argues that the court cut off cross-examination regarding a serious and highly relevant topic, thus causing substantial prejudice.

23. Discretion resides within a trial court to determine the scope and extent of cross examination. See HRE Rule 1101 (1993); Doe v. Doe, 98 Hawai'i 144, 154–55, 44 P.3d 1085, 1095–96 (2002) (discretion resides in a trial court in controlling witnesses). However, a family court's rigid adhesion to time limits constitutes error when a "determination of family violence bears directly upon the best interests of [a] child[,]" and the examination of witnesses is foreclosed. Id.

The court's failure to allow for further reexamination of the maternal grandmother, however, was harmless error. The exclusion of testimony is harmless where the same evidence is established through other means. See Kekua v. Kaiser Found. Hosp., 61 Haw. 208, 221, 601 P.2d 364, 372 (1979). Here, it is apparent that the court did not rely extensively upon the testimony of this witness to make the finding that Father had committed domestic violence. Ample evidence was presented regarding other incidents, including one in which Mother's nose was broken and Father was pending trial for second degree assault.

IX.

For the foregoing reasons, we affirm the court's January 11, 2001 order awarding permanent custody and the January 19, 2001 order denying reconsideration.

Concurring and Dissenting Opinion of MOON, C.J.

Although I concur with the result reached by the majority, I disagree with the majority's overly broad holding that a parent's allegations of a violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131–12134, could *never* be raised as a defense in a proceeding to terminate parental rights. I also disagree with the majority's decision to overrule *In re Jane Doe, Born on February 2, 1999,* 100 Hawai'i 20, 58 P.3d 78 (App.2002) (ICA opinion) and, in effect, to absolutely foreclose the possibility of raising an ADA defense in a termination of parental rights (TPR) proceeding. I, therefore, respectfully dissent.

In *In re Jane Doe,* the ICA stated that the Department of Human Services' (DHS) alleged failure to provide services or programs to the parents, pursuant to an individualized family service plan that accommodated their special needs, was not a defense in a TPR proceeding. The ICA, however, did not conclude that an alleged ADA violation could never be a defense in a TPR proceeding, notwithstanding the fact that it determined that the particular alleged ADA violation set forth by the parents in that case was not a *per se* defense.

Title II of the ADA, specifically 42 U.S.C. § 12132 (1997), states in relevant part:

[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

The majority opinion fails to make the distinction between the "services, programs, or activities" offered by DHS, specifically pursuant to an individualized family service plan, and the TPR proceeding itself.

I agree with the ICA's view that,

while a TPR proceeding may not be a "service" as that term is ordinarily understood, it is clearly a "program or activity" of the family court, a public entity, within the meaning of the ADA. The Ninth Circuit Court of Appeals has made clear that the reach of Title II of the ADA should be as broad as possible. In the case of *Thompson v. Davis,* 295 F.3d 890 (9th Cir.2002) ... the court of appeals reversed the district court's denial of petitioners' ADA claim. The district court had ruled that parole hearings could not be challenged using the ADA because the ADA did not apply to "the substantive decision making process in the criminal law context." *Id.* at 896–897. Disagreeing, the court of appeals stated:

[W]e have interpreted Title II's "programs" and "activities" to include all of the operations of a qualifying local government. In reaching this conclusion, we noted that the legislative history of the ADA strongly suggests that § 12132 should not be construed to allow the creation of spheres in which public entities may discriminate on the basis of an individual's disability....

The logic of the *Thompson* analysis is equally applicable to a TPR proceeding, which, like a parole hearing, involves an adjudication to determine whether an individual's fundamental right must be curtailed for the good of society as a whole. Accordingly, we conclude that a TPR proceeding is a program or activity that is subject to the ADA.

ICA opinion, 100 Hawai'i at 30, 58 P.3d at 88. (Citations and some quotation marks omitted.) The ICA opinion notes several situations in which an ADA defense may be properly raised in a TPR proceeding if, for example, the disabled parents allege that they were discriminated against *in* the TPR proceeding itself by a public entity, *i.e.,* "that the family court had an unwritten policy of automatically terminating parental rights in all cases where both parents of a child are mentally disabled, regardless of their ability to provide a safe family home ... [or] that DHS had a policy of seeking to terminate parental rights of all parents who were men-

tally disabled." ICA opinion at 30–31, 58 P.3d at 88–89.

Because the question whether a TPR proceeding is a "program or activity" of a public entity subject to the ADA is not before the court in this case, I would limit the sweeping scope of the majority's holding to the specific facts of this case and reject the majority's intention to overrule *In re Jane Doe.*