155 P.3d 675

**In the Interest of T CHILDREN,**

**J.K.T. (1), J.N.T., J.J.T., J.K.T. (2), and J.A.T., Jr.**

**No. 27690.**

Intermediate Court of Appeals of Hawai'i.

Feb. 16, 2007.

Certiorari Rejected June 7, 2007.

Herbert Y. Hamada, on the brief, for Father–Appellant.

Patrick A. Pascual and Mary Anne Magnier, Deputy Attorneys General, on the briefs, for Petitioner–Appellee.

BURNS, C.J., WATANABE and FUJISE, JJ.

Opinion of the Court by BURNS, C.J.

The father (Father) of the five subject children in this case appeals from the following orders entered in the Family Court of the First Circuit: (1) the September 1, 2005 Order Awarding Permanent Custody, (2) the October 12, 2005 Order Awarding Permanent Custody, and (3) the November 29, 2005 Orders Concerning Child Protective Act. We affirm.

## BACKGROUND

Father and Mother were married on November 1, 1985. In Hawaii Revised Statutes (HRS) § 587–2 (1993), which is part of Hawai'i's "Child Protective Act", a "child" is defined as "a person who is born alive and is less than eighteen years of age." HRS § 587–2 also defines the "Department" as the State of Hawai'i Department of Human Services (DHS). Hawai'i's Child Protective Act HRS (1993) further states:

§ 587–11 **Jurisdiction.** Pursuant to [section] 571–11(9), the court shall have exclusive original jurisdiction in a child protective proceeding concerning any child who was or is found within the State at the time the facts and circumstances occurred, are discovered, or are reported to the department, which facts and circumstances constitute the basis for the finding that the child is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the acts or omissions of the child's family.

§ 587–12 **Retention of jurisdiction.** Except as otherwise provided in this chapter, jurisdiction invoked by the court under this chapter may be retained by it, for the purposes of this chapter, after the child becomes eighteen years of age until the full term for which any order entered expires or until the child becomes nineteen years of age.

In this case, the intervention by DHS started on June 15, 2004. At that time, one of the children was already eighteen years of age, but DHS had jurisdiction over the following seven children: J.A.K.T., a male born on December 28, 1986; J.T., a female born on August 23, 1988; J.K.T.(1), a male born on September 18, 1989; J.N.T., a female born on January 31, 1991; J.J.T., a female born on July 29, 1993; J.K.T.(2), a female born on January 5, 1996; and J.A.T., Jr., a male born on July 29, 1998.

The Honolulu Police Department assumed protective police custody of the seven children on June 15, 2004, after J.T. reported that over a two-year period Father had subjected her to various forms of sexual harm (sexual contact, cunnilingus, fellatio, and digital and penile penetration), and that Mother had failed to protect her from that sexual harm.

On July 2, 2004, DHS filed two petitions for foster custody. The petition in FC–S No. 04–09814 pertained to J.T.[1] The petition in the instant case, FC–S No. 04–09813, pertained to the other six children.

As a result of J.T.'s report, Father was incarcerated on July 7, 2004. On July 14, 2004, a thirty-four count indictment was filed against Father. That case is pending trial.

On September 2, 2004, Father stipulated to the family court's jurisdiction and to the award of foster custody of the children to DHS. Judge Marilyn Carlsmith granted the July 2, 2004 petition and invoked HRS § 587–42(a) (1993). In its entirety, HRS § 587–42 states:

**Evidence may be inadmissible in other state actions or proceedings; testimony by a child.** (a) Any testimony by or other evidence produced by a party in a child protective proceeding under this chapter, which would otherwise be unavailable, may be ordered by the court to be inadmissible as evidence in any other state civil or criminal action or proceeding, if the court deems such an order to be in the best interests of the child.

---

1. Father is the legal, but not the biological father of J.T.

(b) The court may direct that a child testify under such circumstances as the court deems to be in the best interests of the child and the furtherance of justice, which may include, or be limited to, an interview on the record in chambers with only those parties present as the court deems to be in the best interests of the child.

(c) Any statement made by the child to any person relating to any allegation of imminent harm, harm, or threatened harm shall be admissible in evidence.

On December 28, 2004, the court's jurisdiction over J.A.K.T. expired. On June 22, 2005, J.N.T. consented to the June 21, 2005 Permanent Plan which planned for the termination of Father's and Mother's parental rights and duties with respect to her. On July 6, 2005, DHS filed a motion for permanent custody of the five children over whom the court continued to have jurisdiction.

HRS § 587–73(a) (Supp.2005) states,

**Permanent plan hearing.** (a) At the permanent plan hearing, the court shall consider fully all relevant prior and current information pertaining to the safe family home guidelines, as set forth in section 587–25, including but not limited to the report or reports submitted pursuant to section 587–40, and determine whether there exists clear and convincing evidence that:

(1) The child's legal mother, legal father, adjudicated, presumed, or concerned natural father as defined under chapter 578 are not presently willing and able to provide the child with a safe family home, even with the assistance of a service plan;

(2) It is not reasonably foreseeable that the child's legal mother, legal father, adjudicated, presumed, or concerned natural father as defined under chapter 578 will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable peri-

od of time which shall not exceed two years from the date upon which the child was first placed under foster custody by the court;

(3) The proposed permanent plan will assist in achieving the goal which is in the best interests of the child; provided that the court shall presume that:

(A) It is in the best interests of a child to be promptly and permanently placed with responsible and competent substitute parents and families in safe and secure homes; and

(B) The presumption increases in importance proportionate to the youth of the child upon the date that the child was first placed under foster custody by the court; and

(4) If the child has reached the age of fourteen, the child consents to the permanent plan, unless the court, after consulting with the child in camera, finds that it is in the best interest of the child to dispense with the child's consent.

On September 1, 2005, after a joint trial of FC–S No. 04–09813 and FC–S No. 04–09814, Judge Carlsmith (1) orally decided the case;[2] (2) entered the Order Awarding Permanent Custody that divested the parental and custodial duties and rights of Mother and Father to, and awarded DHS permanent custody of, J.N.T., J.K.T.(2), and J.A.T., Jr.; (3) ordered the June 21, 2005 Permanent Plan into effect;[3] and (4) entered the Orders Concerning Child Protective Act that scheduled a September 21, 2005 in camera interview with, and a February 27, 2006 trial regarding, J.K.T.(1) and J.J.T.

On September 13, 2005, Mother filed a motion for reconsideration. On September 19, 2005, Father filed a motion for reconsideration. In an attached declaration, counsel for Father stated in part:

---

**2.** Judge Carlsmith orally found "that [Father] cannot now nor in the reasonably foreseeable future provide a safe family home for all of the children."

**3.** For J.N.T., J.K.T.(2), and J.A.T., Jr., the goal of the June 21, 2005 Permanent Plan is legal guardianship of J.N.T. and the adoption of J.K.T.(2) and J.A.T., Jr.

3. That [F]ather testified that [he] wants his children placed in the care of his brother, . . . in El Paso, Texas;

4. That [Father's brother] testified by telephone that he is willing and able to provide a safe home for [F]ather's five children while [F]ather is incarcerated and awaiting trial;

5. That [F]ather moves this court for an order reconsidering the awarding of permanent custody because [F]ather is able to provide a safe home through his brother[.]

On September 21, 2005, Judge Carlsmith interviewed J.K.T.(1) and J.J.T. in camera. On September 23, 2005, after a hearing, Judge Carlsmith entered an order stating in part:

4. The Court, sua sponte, advances the 02–27–06 at 8:30 a.m. continued hearing on DHS' Motion for Permanent Custody in this case regarding [J.K.T.(1) and J.J.T.] and . . . in FC–S No. 04–09814 to 10–12–05 at 9:30 a.m., where the court will announce its decision regarding DHS' [sic] Motion for Permanent Custody regarding these Children (in light of the Court's HRS § 587–73(a)(4) interview of these Children). This hearing will be consolidated with the hearing on Mother's and Father's respective Motions for Reconsideration on 10–12–05 at 9:30 a.m.

On October 12, 2005, after a trial, Judge Carlsmith entered the Order Awarding Permanent Custody that (1) divested the parental and custodial duties and rights of Mother and Father to, and awarded DHS permanent custody of, J.T., J.K.T.(1), and J.J.T., (2) ordered the June 21, 2005 Permanent Plan into effect, and (3) scheduled the motions for reconsideration for hearing on November 29, 2005. The goal of the June 21, 2005 Permanent Plan for J.T., J.K.T.(1), and J.J.T. is "Permanent Out of Home Placement till the Age of Majority after Permanent Custody[.]"

On October 20, 2005, Mother filed another motion for reconsideration. On October 26, 2005, Father filed another motion for reconsideration and attached the same declaration of counsel that had been attached to his previous motion for reconsideration. On No-vember 29, 2005, Judge Carlsmith heard and denied all of the motions for reconsideration.

On December 29, 2005, Father filed a notice of appeal in the instant case, FC–S No. 04–09813. Judge Carlsmith retired at the end of December 2005.

On May 16, 2006, in Father's appeal, the Hawai'i Supreme Court entered an order stating, in part, "The family court of the first circuit shall enter its findings of fact and conclusions of law by May 26, 2006." On May 18, 2006, "for [Judge] Marilyn Carlsmith", Judge Bode A. Uale entered Findings of Fact and Conclusions of Law (FsOF and CsOL). The transcript of the September 1, 2005 court proceedings was not filed until June 2, 2006. Transcripts of the other court proceedings in the record were not filed until May 26, 2006.

## DISCUSSION

### I.

 Father contends that he was denied a reasonable period of time to prepare for a continued hearing on the motion for permanent custody for J.K.T.(1) and J.J.T. when on September 23, 2005, the court, sua sponte, advanced the hearing from February 27, 2006 to October 12, 2005. However, Father did not cause the transcript of the September 23, 2005 hearing to be a part of the record on appeal. Moreover, Father does not say that he objected to the court's action or what he might have done differently had he been given that extra time. In light of the record, we conclude that Father was not prejudiced by the family court's action.

### II.

 Hawai'i Family Court Rules Rule 52 (2006) states:

**Findings by the court.**

(a) **Effect.** In all actions tried in the family court, the court may find the facts and state its conclusions of law thereon or may announce or write and file its decision and direct the entry of the appropriate judgment; except upon notice of appeal filed with the court, the court shall enter

its findings of fact and conclusions of law where none have been entered, unless the written decision of the court contains findings of fact and conclusions of law. To aid the court, the court may order the parties or either of them to submit proposed findings of fact and conclusions of law, where the written decision of the court does not contain the findings of fact and conclusions of law, within 10 days after the filing of the notice of appeal, unless such time is extended by the court. Requests for findings are not necessary for purposes of review. Findings of fact if entered shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If a decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.

(b) **Amendment.** Upon motion of a party made not later than 10 days after entry of judgment the court may amend its findings or make additional findings and may amend the judgment accordingly. The motion may be made with a motion for a new trial pursuant to Rule 59. When findings of fact are made by the court, the question of sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the family court an objection to such findings or has made a motion to amend them or a motion for judgment.

(c) **Submission of draft of a decision.** At the conclusion of a hearing or trial, or at such later date as matters taken under advisement have been decided, the judge for convenience may designate the attorney for one of the parties to prepare and submit a draft of a decision, containing such provisions as shall have been informally outlined to such attorney by the judge. The attorney requested to prepare the proposed decision shall, within 10 days, unless such time is extended by the court, deliver a draft of the decision to the division clerk. Upon review and finalization of form by the judge, the decision shall be entered.

Father contends that Judge Bode Uale was not authorized to enter FsOF nos. 109, 110, 116, 118, 120, 121, 122, 123, 124, 126, 127, 135 and 139 because (a) Judge Uale was not the trial judge, (b) these FsOF are based on an assessment of credibility, and (c) the transcripts were not available when Judge Uale entered these findings of fact. We agree with Father.[4]

However, although Judge Carlsmith did not enter preliminary findings of fact before she retired, she did enter ultimate findings of fact. The September 1, 2005 Order Awarding Permanent Custody states in part:

Based upon the record and/or the evidence presented, the Court finds by clear and convincing evidence that pursuant to HRS 587–73(a) and after full consideration of the relevant prior and current evidence pertaining to the safe family home guidelines, as set forth in HRS 587–25, including, but not limited to, the report/s submitted pursuant to HRS 587–40, that:

A̲ The child(ren)'s[5] legal mother, legal father, adjudicated, presumed, or concerned father as defined under HRS Chapter 578 are not presently willing and able to provide the child(ren) with a safe family home, even with the assistance of a service plan;

B̲ It is not reasonably foreseeable that the child(ren)'s legal mother, legal fa-

---

**4.** Hawai'i Family Court Rules Rule 63 (2006) states:

**Disability of judge.**

If by reason of retirement, ..., a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a decision is announced and filed, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that those duties cannot be performed because that judge did not preside at the trial or for any other reason, the replacement judge has the discretion to grant a new trial.

In this case on appeal, more than a "decision" was announced and filed.

**5.** "Child(ren)['] refers to [J.N.T., J.K.T.(2), and J.A.T., Jr.] only[.]

ther, adjudicated, presumed, or concerned father as defined under HRS Chapter 578 will become willing and able to provide the child(ren) with a safe family home, even with the assistance of a service plan, within a reasonable period of time;

C The proposed permanent plans attached hereto as Exhibit "A" is in the best interests of the child(ren);

D [J.N.T.] have [sic] reached the age of fourteen and consent [sic] to the permanent plan regarding them [sic] respectively [sic][.]

(Footnote replaces asterisk.) The October 12, 2005 Order Awarding Permanent Custody states in part:

Based upon the record and/or the evidence presented, the Court finds by clear and convincing evidence that pursuant to HRS 587–73(a) and after full consideration of the relevant prior and current evidence pertaining to the safe family home guidelines, as set forth in HRS 587–25, including, but not limited to, the report/s submitted pursuant to HRS 587–40, that:

A The child(ren)'s [6] legal mother, legal father, adjudicated, presumed, or concerned father as defined under HRS Chapter 578 are not presently willing and able to provide the child(ren) with a safe family home, even with the assistance of a service plan;

B It is not reasonably foreseeable that the child(ren)'s legal mother, legal father, adjudicated, presumed, or concerned father as defined under HRS Chapter 578 will become willing and able to provide the child(ren) with a safe family home, even with the assistance of a service plan, within a reasonable period of time;

C The proposed permanent plans attached hereto as Exhibit "A" is in the best interests of the child(ren);

. . . .

D [J.K.T.(1) ] has reached the age of fourteen and it is in the best interests of [J.K.T.(1) ] to dispense with his consent to the permanent plan[.]

(Footnote renumbered.) These ultimate findings of fact are not clearly erroneous and, in the circumstances of this case, they adequately support Judge Carlsmith's orders terminating parental rights and duties and awarding permanent custody to DHS.

## III.

FOF no. 140 states, "[Father's brother] is found to be a credible witness but the court does not give much weight to his testimony (regarding his willingness to be a placement resource for the Children), and his testimony is not relevant."

COL no. 5 states:

Father argued that his parental rights should not be terminated because his . . . brother . . . can provide a "safe" placement for the Children, based on Father's interpretation of In re Doe, 100 Hawai'i 335, 345, 60 P.3d 285, 296 (2002), specifically the sentence, "An imprisoned parent may have other family members who would be able to care for the child during the confined parent's absence." Id. at 335, 60 P.3d at 296, citing [Diernfeld] v. People, 137 Colo. 238, 323 P.2d 628 (1958). Father incorrectly interprets the above cases, and his argument is without merit.

Challenging FOF no. 140 and COL no. 5, Father contends that the weight of the evidence is that Father was/is willing and able to provide a safe home for the children through Father's brother. This challenge is based on the following precedent:

We note, first, that involuntary confinement, a criminal charge, or conviction for a criminal offense does not mandate a per se forfeiture of a parent's rights to a child. See In re J.M.S., 83 S.W.3d 76, 83 (Mo.Ct. App.2002) (citing to a governing statute and holding that incarceration by itself is not grounds for termination of parental rights); In re Brian D., 209 W.Va. 537, 550 S.E.2d 73, 76 (2001) ("[I]ncarceration, per se, does not warrant the termination of an incarcerated parent's parental rights.") (Italics in original.); In re F.N.M., 951 S.W.2d 702, 706 (Mo.Ct.App.1997) (holding that incarceration, in and of itself, may not

6. "[C]hild(ren)('s)" refers to [J.K.T.(1) ] and [J.J.T.].

be grounds for termination of parental rights); *In re Staat*, 287 Minn. 501, 178 N.W.2d 709, 713 (1970) ("[S]eparation of child and parent due to misfortune and misconduct alone, such as incarceration of parent" is not per se grounds for termination); *Diernfeld v. People*, 137 Colo. 238, [244] 323 P.2d 628, 631 (1958) ("We cannot hold that every convicted felon, by that fact alone, loses all parental rights in children."). For instance, an imprisoned parent may have other family members who would be able to care for the child during the confined parent's absence.

However, incarceration may be considered along with "other factors and circumstances impacting the ability of the parent to remedy the conditions of abuse and neglect." *In re Brian D.*, 550 S.E.2d at 77. Thus, if the sole caretaker of a child is confined for a long period of time, the lack of permanence or guidance in the child's life may be a factor in considering whether the parent may be able to provide a safe family home within a reasonable period of time.

*In re Doe*, 100 Hawai'i 335, 345, 60 P.3d 285, 295 (2002). This precedent, however, must be interpreted and applied in the light of, and subject to, HRS § 587–73 (Supp.2005).

■ In other words, termination of parental rights should not occur when the parent is presently willing and able to provide the child(ren) with a safe family home except for the fact that the parent is in confinement for a period not exceeding two years from the date upon which the child(ren) were first placed under foster custody by the court or, although the parent is not presently willing and able to provide the child(ren) with a safe family home, it is reasonable foreseeable that, notwithstanding parent's confinement for a period not exceeding two years from the date upon which the child(ren) were first placed under foster custody by the court, the parent will become willing and able to provide the child(ren) with a safe family home within a reasonable period of time which shall not exceed two years from the date upon which the child(ren) were first placed under foster custody by the court.

■ In contrast, when the parent is not presently willing and able to provide the child(ren) with a safe family home and it is not reasonably foreseeable that the parent will become willing and able to provide the child(ren) with a safe family home within a reasonable period of time which shall not exceed two years from the date upon which the child(ren) were first placed under foster custody by the court, the fact that the parent has a relative who is presently willing and able to provide the child(ren) with a safe family home until the parent's eventual release from confinement is not a basis for denying a motion by DHS for termination of the parent's parental rights.

## CONCLUSION

Accordingly, we affirm the (1) September 1, 2005 Order Awarding Permanent Custody, (2) October 12, 2005 Order Awarding Permanent Custody, and (3) November 29, 2005 Orders Concerning Child Protective Act. We vacate the Findings of Fact and Conclusions of Law entered on May 18, 2006.

